**UNITED STATES of America**

v.

**Steven COX, et al.**

**Crim. No. L–92–0371.**

United States District Court, D. Maryland.

Aug. 31, 1993.

1192

William H. Murphy, Jr., Baltimore, MD, for defendant Cox.

Gary A. Ticknor, Baltimore, MD, for defendant Martinez.

Stanley Needleman, Baltimore, MD, for defendant Sinclair.

Lynne A. Battaglia, U.S. Atty., and Thomas M. DiBiagio, Asst. U.S. Atty., Baltimore, MD, for U.S.

## MEMORANDUM & ORDER

LEGG, District Judge.

Defendants, who are charged with conspiracy to commit interstate murder for hire, have filed pretrial motions raising a number of issues.[1] The Court heard testimony from almost a dozen witnesses during the lengthy evidentiary hearing.[2] The following motions are ripe for decision:

1. Motion to suppress audio and video tapes and the fruits thereof, on the ground that the cooperating witness did not give his voluntary consent (paper 83);

2. Oral motion to compel the testimony of Bernard Christian on the ground that he waived his Fifth Amendment privilege either by (a) testifying at the motions hearing, (b) entering into a plea agreement with the government, (c) talking to the Probation Department in its preparation of his presentence investigation ("PSI"), and/or (d) his participation in the proffer session with the government;

3. Motion to unseal the PSIs of Christian, Calvin Deair, and Thomas Faulkner (paper 92);

4. Oral motion to allow defendants to conduct an evidentiary hearing concerning Christian's false statements to the government;

5. Motion for the government to turn over exculpatory evidence (paper 97); and

6. Motion for the government to produce notes taken during proffer sessions between the government and cooperating government witnesses (paper 50).

For the reasons which follow, the defendants' motions are DENIED.

### I. FINDINGS OF FACT:

After hearing extensive testimony and the argument of counsel, the Court makes the following findings of fact for the purpose of resolving the pending motions:

1. On September 16, 1992, Bernard Christian voluntarily boarded an Amtrak train in New York City bound for Pennsylvania Station in Baltimore. On his arrival at the train station in Baltimore, Christian was approached by plain-clothed Baltimore City Police Officer Gary Cover who identified himself as a police officer. Cover made a consensual search of Christian's gym bag and then arrested Christian after finding two nine-millimeter pistols.

2. At the time of his arrest on September 16, 1992, Christian walked with a slight limp

---

1. The defendants are Steven Cox, Mario Martinez, Floyd Sinclair, and Emmanuel Umgebolu. Umgebolu is in Canada and has not been extradited. Accordingly, only Cox, Martinez, and Sinclair are standing trial. They were charged in an eight count indictment of the following crimes: Conspiracy, 18 U.S.C. § 371; Use of Interstate Facilities in the Commission of a Murder for Hire, 18 U.S.C. § 1958; Use and Carrying of a Firearm During and in Relation to a Crime of Violence, 18 U.S.C. § 924(c); Conspiracy, 18 U.S.C. § 1959; Violent Crime in Aid of Racketeering Activity, 18 U.S.C. § 1959; Possession with Intent to Distribute, 21 U.S.C. § 841(a)(1); Attempted Distribution, 21 U.S.C. §§ 841(a)(1), 846; Aiding and Abetting, 18 U.S.C. § 2. *See* Third Superseding Indictment.

The defendants have adopted all motions filed by other defendants.

2. The following witnesses testified: Special Agent Michael Kula of the Drug Enforcement Administration ("DEA"); Special Agent Helen Bass of the DEA; Bernard Christian; Dr. Joseph Siko, Jr.; Dr. Lawrence Bizer; Dr. Sean O'Rourke; Dr. Ignatius Komminakos; Captain Michael Andrew of the Baltimore City Police Department; Detective Sergeant Norman Meades of the Baltimore City Police Department; Amtrak Investigator Calvin Burns; and Detective Anita Hicks of the Baltimore City Police Department.

as the result of a March, 1992 gunshot wound to his right thigh. Christian underwent surgery in March, 1992 to correct damage to his femur and an artery in his right thigh. During this surgery a rod was implanted in the thigh because the gunshot had fractured Christian's femur. As a result of the gunshot wound and the subsequent surgery, Christian's right leg had extensive scars on both sides from ankle to hip.

3. After the March, 1992 surgery, Christian suffered an infection of his great right toe for which he was hospitalized at North Central Bronx Hospital on two occasions—first, from June 23 through June 29, 1992, and again, from July 1 through July 5, 1992. He was under the care of Dr. Lawrence Bizer on both occasions. Christian left the hospital against medical advice on June 29, and when he returned on July 1, Christian had osteomyelitis (a deep bone infection) of the great right toe. He received intravenous antibiotics, ameliorating the infection before his release on July 5, 1992.

4. Christian was again treated for osteomyelitis of the great right toe from August 3 through August 24, 1992 at Montefiore Hospital under the care of Dr. Sean O'Rourke. While hospitalized, Christian received intravenous antibiotics. Before he had completed the course of intravenous antibiotics, however, Christian checked out of the hospital against Dr. O'Rourke's advice. Dr. O'Rourke testified that Christian needed, at a minimum, another week of intravenous antibiotics and that an additional three or four weeks would have been optimal. Dr. O'Rourke prescribed oral antibiotics when Christian checked out. He also offered to prescribe a pain killer but Christian declined. O'Rourke told Christian that if he did not take the antibiotics his toe might get worse and that amputation might become necessary. As a result of the osteomyelitis, Christian's toe was partially insensate.

5. Following his departure from the hospital, Christian did not strictly follow Dr. O'Rourke's orders. Christian testified that he took the oral antibiotics but not as regularly as directed.

6. After his release from the hospital, but approximately two weeks before his arrival in Baltimore, Christian stubbed his great right toe. This aggravated the toe's condition, but Christian apparently did not appreciate the extent of the renewed infection. When he arrived in Baltimore, his toe was still infected and caused him some pain. Christian characterized his pain as "bearable" and akin to the pain of a sprained thumb. According to Christian, he was in pain no greater than he was experiencing when he checked himself out of Montefiore Hospital.

7. As evidenced by Christian's voluntary trip to Baltimore, the pain in his toe was not so severe that it stopped his daily activity. Nor was the pain so severe that it impeded his ability to think clearly.

8. Cover and other police officers involved in Christian's arrest noticed Christian's slight limp; when they asked Christian about it, he replied that he had been shot in the right thigh and had undergone surgery.

9. Immediately following his arrest, the police read Christian his Miranda rights and then led him to the police office at the train station. There he was patted down, his underwear was checked for drugs,[3] and he was handcuffed to the bench in the holding cell. While in custody at the Amtrak station, Christian signed a Miranda form which acknowledged that he had been read his rights and understood them. At the hearing, Detective Sergeant Norman Meades was unable to produce the Miranda form signed by Christian; he testified that he had misplaced it. Defendants invited the Court to find that Meades was prevaricating and that no such form ever existed. Meades' story, however, is fully corroborated by Christian, who testified that he and an officer reviewed a Miranda form which he signed.

10. Christian testified that he was strip-searched in the holding cell. This testimony, however, was contradicted by the testimony

3. Meades testified that he undid Christian's pants and looked down into Christian's underwear but that at no point did he pull down Christian's pants or otherwise have occasion to see Christian's naked leg or toe.

of Detective Sergeant Meades, Amtrak Investigator Burns, and Detective Anita Hicks. This Court concludes that Christian was not strip-searched at the Amtrak station nor at any other time prior to the completion of his cooperation.[4]

11. Approximately fifteen minutes after being placed in the holding cell, Christian asked to speak to Meades. Christian then told Meades he had some information for him and would like to cooperate.

12. After Christian initiated his cooperation, he was taken to Baltimore City Police Headquarters where he was booked and then interviewed by Baltimore City Police officers and federal DEA agents. Christian told the police that the pistols were to be used to murder a man named "Pluck" in retaliation for Pluck's theft of drugs. Christian said that he was to meet certain individuals at a hotel and that these individuals would actually carry out the murder with the guns the police had confiscated from Christian. He remained at police headquarters until approximately 11:00 p.m., when he was taken to the Days Inn on Lombard Street in downtown Baltimore. The DEA had rented two adjacent rooms, one of which the agents wired for audio and video surveillance. Two of the defendants, Cox and Martinez, subsequently joined Christian in the room, and spent the night of September 16. No prior judicial approval for audio and video monitoring was obtained, but Christian was fully aware that he was being video and audio taped. Prior to being placed in the room under surveillance, Christian was informed that he could refuse to participate in the videotaping. Various DEA agents and Balti-more City Police officers then monitored the surveillance from the adjacent room.

13. Early in his direct examination (he was called by the defendants), Christian testified that he neither requested nor expected immediate medical attention during the period of his cooperation. Rather, he said that he mentioned the condition of his leg to the police soon after his arrest because he wanted the authorities to know that he was "not a healthy person." His aim was to see a doctor when he was eventually processed into jail. Christian testified that he had expressed no urgent need to see a doctor. Later on direct, however, under highly suggestive leading questions by defendants' counsel (because Christian was a former cooperating witness for the government, defense counsel were allowed to lead), Christian contradicted himself, claiming that he repeatedly asked for immediate medical attention throughout the evening of September 16 and into the morning of September 17, 1992.[5]

14. This Court credits Christian's early testimony when he told his story in a more narrative form. The Court finds that during his cooperation on September 16 and 17, Christian neither requested to see a doctor immediately nor complained to the police about pain in his leg or toe. The surveillance videotape provides the best evidence of Christian's then-existing state of health and mind. The tape shows Christian moving, acting, and conversing normally. He was not in enough pain to cloud his thinking.[6] Also, during the surveillance, Christian had at least three opportunities (when he was alone in the hotel room) to tell the officers that he

---

4. DEA Special Agent Helen Bass testified that someone at police headquarters told her the night of Christian's arrest that someone had seen the scars on Christian's legs. However, no one told her that Christian needed medical attention (including Christian himself), and Bass was likely confused as to who told her what about the leg that evening. She knew that Christian had a problem with his leg, but she had no reason to believe that it required immediate medical attention.

5. Early in his testimony, Christian testified that he never complained to the police about any pain in his leg or foot.

6. Christian had many opportunities to request aid that night. He was in the presence of several groups of officers in the Amtrak station, at police headquarters, and at the hotel. All of the officers who testified said that Christian never complained of pain or requested immediate attention. The surveillance tape shows that on at least two occasions Christian complained of pain to his confederates in the room. Presumably, the officer monitoring the area could have heard Christian's statements. Nevertheless, the complaints would not have put the officer on notice that Christian needed on-the-spot medical care. He only complained several times during the course of some six hours of tape, and his overall bearing did not reflect a high level of pain.

wished to terminate his cooperation and see a doctor. He did not do so, however.[7]

15. As Christian testified, he did not believe that medical treatment was contingent upon his cooperation. He thought he would receive medical treatment even if he refused to participate in the videotape. The only promise that the police made to Christian was that his cooperation would be brought to the attention of the prosecutorial authorities.

16. Following his cooperation, Christian was taken to the Baltimore City jail where he was seen by a nurse. Upon examining his toe, the nurse called in a physician. On September 18, 1992, Christian was taken to the emergency room ("ER") at the University of Maryland Hospital, where he was seen by Dr. Ignatius Komminakos. When he presented to the ER, his toe was red and inflamed but not tender to the touch. Dr. Komminakos expressed pus from the toe and prescribed oral antibiotics. Komminakos referred Christian to regular rotation in the podiatry clinic, where he was seen on September 21, 1992 by Dr. Siko. At that time, Christian was diagnosed with cellulitis as well as osteomyelitis of the great right toe. The toe was insensate. Subsequently, on September 23, 1992, Dr. Siko performed a partial amputation of Christian's great right toe. The amputation occurred that date rather than upon initial presentment to the ER because the doctors on September 18 considered the infection to be non-life-threatening and possibly manageable with oral antibiotics.

17. With the assistance of counsel, Christian signed a plea agreement with the United States Attorney and entered a plea of guilty before this Court. Thereafter, the United States Probation Department prepared a presentence report on Christian.

18. Before Christian was sentenced, however, the government withdrew his plea agreement. The government learned that Christian had been untruthful at a debriefing session during which he attributed to the defendants herein crimes unrelated to the instant offenses. With the Court's consent, Christian thereafter withdrew his guilty plea and is now awaiting trial on federal charges arising out of the alleged murder-for-hire conspiracy.

## II. *DISCUSSION*

### A. *Motion to Suppress Audio and Video Tapes*

Defendants have moved to suppress the audio and video tapes made at the Days Inn motel.[8] For the reasons set forth below, defendants' motion is DENIED.

Defendants analyze the audiotapes and videotapes separately. They argue that the audiotapes are inadmissible because Christian's consent was involuntary. They argue that admissibility of the videotapes is governed by the Fourth Amendment because videotaping is more intrusive than audiotaping and constitutes a search and seizure of their images. Using a search and seizure analysis, defendants contend that Christian's consent to the videotaping, even if voluntary, is insufficient because (i) there was no agency relationship between Christian and the defendants, and (ii) Christian, as a governmental agent, could not validly consent to a search and seizure of a hotel room they shared with him.

 The Court will first address the admissibility of the audiotapes. Generally speaking, the government may tape a telephone or face-to-face conversation without a search warrant or judicial wiretapping order if one of the participants in the conversation is either a governmental agent or has given his consent. The taping is often accomplished by a body wire, "bugging" a room, or listening in on a telephone conversation. The pertinent statute, 18 U.S.C. § 2511(2)(c), provides that "[i]t shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior

---

**7.** Bass called Christian in the Days Inn room once, Kula called once, and Kula went into the room once while Christian was alone.

**8.** Two of the defendants, Cox and Martinez, appear on the tapes. The other two defendants, Sinclair and Umgebolu, do not.

consent to such interception." [9] In the instant case, Christian was acting as a governmental agent under the direction of DEA agents and Baltimore City police officers. Because, as this Court has found, Christian voluntarily consented to and participated in the audiotaping, the recordings are lawful under the statute.

■ The audio recordings are also permitted under the Fourth Amendment. Absent some special circumstance (such as an attorney-client privilege), no right of privacy or other protection attaches to words spoken by one individual to another individual; the speaker assumes the risk that his auditor may repeat the conversation to others. Thus, when defendants spoke with Christian in the hotel room, they assumed the obvious risk that he would later repeat the conversations to the authorities or in court. Therefore, a person who converses with another, whether in person or by telephone, has no constitutionally protected expectation that his listener is not capturing his words on tape. As enunciated by the Eleventh Circuit, the general rule is that:

> a defendant has no justifiable expectation of privacy when he speaks with someone acting as a government informant, and is unaware that a recording device is concealed in the room. As long as one of the parties to a conversation knows of and consents to the recording, the fourth amendment is not violated when the government records the exchange and uses the evidence so gathered in a subsequent criminal prosecution.

*United States v. Laetividal–Gonzalez,* 939 F.2d 1455, 1460–61 (11th Cir.1991) (citing *United States v. White,* 401 U.S. 745, 752, 91 S.Ct. 1122, 1126, 28 L.Ed.2d 453 (1971)), *cert.*

*denied,* —— U.S. ——, 112 S.Ct. 1280, 117 L.Ed.2d 505 (1992).[10]

■ The government bears the burden of proving that the cooperator's consent was voluntary and was not the product of coercion. *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1323, 75 L.Ed.2d 229 (1983) (plurality opinion); *United States v. Antoon,* 933 F.2d 200, 203–06 (3d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 300, 116 L.Ed.2d 243 (1991). Whether consent is voluntary is a question of fact which the district court must determine from the totality of the circumstances. *United States v. Gomez,* 947 F.2d 737, 738 (5th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1504, 117 L.Ed.2d 642 (1992). Hopes for leniency do not vitiate consent. *United States v. Kolodziej,* 706 F.2d 590, 593 (5th Cir.1983).

■ The "voluntariness" standard in the consensually monitored communications context is less stringent than in the search and seizure context. *United States v. Fuentes,* 563 F.2d 527, 533 (2d Cir.), *cert. denied,* 434 U.S. 959, 98 S.Ct. 491, 54 L.Ed.2d 320 (1977); *United States v. Abreu,* 730 F.Supp. 1018, 1030 (D.Colo.1990), *aff'd,* 935 F.2d 1130 (10th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 271, 116 L.Ed.2d 224 (1991). "In order to establish consent to taping of conversations, it will ordinarily suffice for the government to show that the informant engaged in the conversation knowing that it was being taped." *United States v. Glickman,* 604 F.2d 625, 634 (9th Cir.1979), *cert. denied,* 444 U.S. 1080, 100 S.Ct. 1032, 62 L.Ed.2d 764 (1980).

In this case, defendants contend that Christian's consent was not voluntary because (a) the pain in his foot robbed Christian of his senses and because (b) the govern-

---

**9.** If the Court were to conclude that Christian was not acting under color of law, i.e., not acting as a government agent, the analysis would be identical because, under 18 U.S.C. § 2511(2)(d), communications may be legally intercepted by a person not acting under color of law if one party to the communication consents to the monitoring.

**10.** *See also United States v. Barone,* 913 F.2d 46, 49 (2d Cir.1990) (if informer consents, court order or defendant's consent unnecessary); *United States v. King,* 587 F.2d 956, 962 (9th Cir. 1978) (recording made by government agent

with consent of one participant does not violate Fourth Amendment); *United States v. Hodge,* 539 F.2d 898, 905 (6th Cir.1976), *cert. denied,* 429 U.S. 1091, 97 S.Ct. 1100, 51 L.Ed.2d 536 (1977) (Fourth Amendment not violated because defendant has no reasonable expectation of privacy); *United States v. Rich,* 518 F.2d 980, 984–85 (8th Cir.1975), *cert. denied,* 427 U.S. 907, 96 S.Ct. 3193, 49 L.Ed.2d 1200 (1976) (if informer consents, Title III not violated); *United States v. Quintana,* 508 F.2d 867, 872 n. 3 (7th Cir.1975) (no reasonable expectation of privacy).

ment, either tacitly or explicitly, communicated to Christian that he would be treated only after he cooperated. The Court rejects these arguments as contrary to the evidence.

■ Christian's toe was indisputably infected at the time of his arrest and his cooperation with the Baltimore City Police and the DEA. Nevertheless, Christian's pain was not severe enough to vitiate his consent. Although he may have been in pain, Christian himself testified that his pain was tolerable and that he was fully capable of making reasoned decisions.[11]

The remaining issue, then, is whether the government knew about the infection and coerced Christian's cooperation by threatening to withhold medical care until the video and audio surveillance was complete. This issue raises two sub-issues. First, did the government tell Christian he would get medical care but then failed to get him care prior to the completion of the surveillance, thereby conveying the message that Christian would receive medical care only after his cooperation was complete? Second, even if Christian said he wanted to cooperate immediately and obtain medical treatment later, is the government required to provide immediate treatment if it believes (or has reason to believe) that immediate treatment is necessary?

■ As to the first point, the Court finds that the governmental agents did not threaten Christian, nor did they condition medical treatment upon successful completion of the surveillance. As to the second point, this Court finds that the government was unaware of Christian's need for immediate medical attention.[12] No governmental agent saw Christian's infected toe until he was eventually processed into jail. Christian did not himself request immediate care. Thus, the facts of this case do not call upon the

Court to decide whether the government may accept cooperation from a person who is willing to provide it but who (the government knows) risks serious physical injury from a delay in hospitalization.[13]

■ The remaining question before the Court is whether the Fourth Amendment prohibits consensual video (as opposed to audio) surveillance. Defendants contend that video surveillance constitutes a far greater intrusion into their privacy than does audio surveillance and, therefore, should be governed by the Fourth Amendment case law developed in the search and seizure context. Defendants further assert that the consent of one individual is insufficient to waive their legitimate expectations of privacy while in the motel room. The Court disagrees.

Although only a small number of courts have addressed the issue of the constitutionality of consensual video surveillance, they are unanimous in concluding that it is not violative of the Fourth Amendment. In *United States v. Myers*, 692 F.2d 823 (2d Cir.1982), *cert. denied*, 461 U.S. 961, 103 S.Ct. 2437, 77 L.Ed.2d 1322 (1983), the Court rejected a Fourth Amendment challenge to a videotape of a defendant's conversations with undercover agents, finding that the "conversations with undercover agents in whom he chose to confide were not privileged, and mechanical recordings of the sights and sounds to which the agents could have testified were proper evidence." 692 F.2d at 859. The Eastern and Southern Districts of New York have both found that consensual video taping did not violate the Fourth Amendment. *See United States v. Echeverri*, No. 91–CR–885, 1992 WL 302907, 1992 U.S.Dist. LEXIS 15589, at *4–5 (E.D.N.Y. Oct. 5, 1992); *United States v. Napolitano*, 552 F.Supp. 465, 483 (S.D.N.Y.1982).

---

11. The United States Court of Appeals for the District of Columbia recently held that a man's consent to a search of his safe was voluntary even though he consented while lying untreated in a hospital emergency room after suffering a gunshot wound. *United States v. Mason*, 966 F.2d 1488, 1494 (D.C.Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 829, 121 L.Ed.2d 699 (1992).

12. Additionally, as Christian's subsequent medical history bears out, Christian's need for medi-

cal attention was not so pressing that a delay of several days would threaten his life or health.

13. Christian is himself a defendant in a separate criminal case arising from the same alleged murder-for-hire scheme. Christian, through counsel, has informed the Court that he is not contending that his cooperation in the Days Inn surveillance tapes was involuntary.

Under the facts presented here, the Court can find no principled and compelling rationale for constructively differentiating video from audio surveillance. A person who commits an act in the presence of another has no expectation that his companion will not describe the act to the police.[14]

The Court recognizes that clandestine video surveillance of a private room is intrusive and that the law generally requires the approval of a neutral judicial officer before the police may wiretap, search, or bug a room. The "consent of one of the parties" exception creates a large exception to this rule. Under different facts, the Court might find that the intrusion so great as to be constitutionally impermissible. This case, however, does not present such facts. For example:

(i) Christian was in the room at all times, so that the police were not in a position to monitor conversations and actions that occurred outside Christian's presence;

(ii) The hotel room was small, and the electronic surveillance did not pick up any words or actions that were outside Christian's hearing and sight;

(iii) Defendants were under the impression that Christian had rented and paid for the room. They were simply "guests" there;

(iv) Having seen the pistols Christian was carrying and heard his story of the murder-for-hire plot, the police had good reason to believe that they had intercepted a felony in progress. Thus, the surveillance was not animated by a generalized police interest in spying on citizens to see what might turn up.

For these reasons, the defendants' motion to suppress the videotapes and the fruits thereof is DENIED.[15]

### B. *Christian's Potential Fifth Amendment Waiver* [16]

During the suppression hearing, defendants orally requested the Court to compel Christian to testify on all subjects on the ground that he has waived his Fifth Amendment right against self-incrimination. Their arguments relate to two events—(i) Christian's guilty plea to the murder-for-hire scheme, and (ii) his testimony at the suppression hearing in the instant case.

Defendants first argue that Christian waived his Fifth Amendment rights when he pled guilty because, in so doing, he admitted participating in the scheme and he acknowledged committing the acts described in his written plea agreement with the government.[17] Christian's guilty plea was revoked, however, and both the plea agreement itself as well as any statements he made in the course of plea negotiations may not be used against him.[18] Fed.R.Crim.P. 11(e)(6);

---

**14.** Although defendants cite *United States v. Torres*, 751 F.2d 875, 877 (7th Cir.1984), *cert. denied*, 470 U.S. 1087, 105 S.Ct. 1853, 85 L.Ed.2d 150 (1985), as support for their contentions, *Torres* did not involve consensual video surveillance but rather non-consensual video surveillance pursuant to a search warrant. Similarly, *United States v. Koyomejian*, 970 F.2d 536, 538 (9th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 617, 121 L.Ed.2d 550 (1992), involved non-consensual video surveillance. Thus, the Fourth Amendment analysis in those cases is inapplicable to the instant case, in which a warrant was neither required nor obtained.

**15.** The Court notes that the "fruits" of the video surveillance were also fruits of the audio surveillance, which the defendants concede did not violate their Fourth Amendment rights. Thus, even if the Court were to suppress the videotapes, the Court would still permit the fruits of the surveillance to be admitted into evidence.

**16.** The government has filed a motion *in limine* which seeks to prevent the defendants from calling Christian as a witness at trial solely for the

purpose of impeaching him. Defendants contend that they have a Sixth Amendment right to cross-examine Christian because his statements on the audio and videotapes constitute testimony against them. That motion is not now ripe for decision.

**17.** The plea agreement, which was later stricken, was Court Exhibit No. 1 and contained stipulations of fact.

**18.** This is true even though the Supreme Court has recognized that a guilty plea constitutes the defendant's waiver of his rights to trial by jury, to confront the witnesses against him, and not to incriminate himself. *See Boykin v. Alabama*, 395 U.S. 238, 243, 89 S.Ct. 1709, 1712, 23 L.Ed.2d 274 (1969).

The same reasoning applies to defendants' contention that Christian waived his Fifth Amendment right by participating in proffer sessions with the government. Proffer sessions are also encompassed by this rule.

This policy is particularly appropriate in a case such as this one in which the guilty plea is

Fed.R.Evid. 410. Accordingly, this Court declines to hold that Christian waived his Fifth Amendment privilege by pleading guilty.

■ Defendants next argue that Christian waived his Fifth Amendment rights by speaking to the Probation officer who prepared his PSI. This Court disagrees. To the extent that Christian discussed personal information about himself, that is not a waiver. To the extent that the facts of the offense are set forth in the PSI, they form a part of proceedings related to Christian's guilty plea and therefore cannot be used against him. *See* Fed.R.Crim.P. 11(e)(6); Fed.R.Evid. 410.

■ Defendants contended that Christian also waived his Fifth Amendment rights by testifying at the suppression hearing. Christian, who was represented by Robert Durkin, Esq., his court-appointed counsel, was called by defendants rather than the government. Christian originally asserted the Fifth Amendment as to all questions. The Court, however, ruled that questions involving Christian's physical condition and his conversations with the authorities concerning his condition did not tend to incriminate him and ordered Christian to answer them.[19] Virtually all of Christian's protracted testimony concerned these subjects. Nevertheless, during

the course of his lengthy testimony, and while describing his conversation with the police, Christian stated (in essence) that after his arrest (and while he was cooperating), he telephoned New York and asked for defendant Mario Martinez to be sent to Baltimore, thus inferring that Martinez would not have come to Baltimore but for the call. The pending indictment alleges that Martinez and the other defendants travelled to Baltimore to kill a man named "Pluck." Defendants, particularly Martinez, wish to call Christian at trial and explore this subject more extensively.

■ Generally, a defendant's testimony at a former trial is admissible against him at a later trial. *Harrison v. United States,* 392 U.S. 219, 222, 88 S.Ct. 2008, 2010, 20 L.Ed.2d 1047 (1968). Nevertheless, a defendant's testimony in one proceeding is not necessarily a waiver of his Fifth Amendment right not to testify in a subsequent proceeding. *United States v. Fortin,* 685 F.2d 1297, 1298 (11th Cir.1982) (per curiam).[20] This result is logical because affirmation of a previous statement gives it more credence and because testifying to it again may constitute a further waiver which could open the witness to further questioning.

■ Even in cases of testimony received in the same proceeding, prior testimony may

---

withdrawn following the government's decision to revoke the plea agreement.

Although Christian is not a co-defendant in the instant case, his testimony at the trial could be used against him at his own trial. *See Harrison v. United States,* 392 U.S. 219, 222, 88 S.Ct. 2008, 2010, 20 L.Ed.2d 1047 (1968). Christian, therefore, has a real and immediate fear that anything he now says concerning the alleged murder-for-hire conspiracy could be used against him later.

During the suppression hearing, this Court denied defendants' motion to immunize Christian. Christian is a defendant in a separate proceeding in which he is charged in a three-count indictment with conspiracy to use interstate facilities in the commission of a murder for hire, use of interstate facilities in the commission of a murder for hire, aiding and abetting, and use and carrying of a firearm during and in relation to a crime of violence. *See* 18 U.S.C. §§ 2, 371, 924(c), and 1958. He is scheduled to go to trial on October 18, 1993.

19. During the hearing, the ground rules for questioning were that substantive questions about the alleged crime were off-limits. Christian and his

counsel objected to many questions on Fifth Amendment grounds. Some objections were sustained, some were overruled, and in some instances the question was refined so as to stick to the non-incriminating subjects of his physical condition and what the police said to him.

20. *Accord United States v. Smith,* 940 F.2d 710, 713 (1st Cir.1991) (defendant's testimony at pretrial hearing not a waiver of his Fifth Amendment right not to testify at trial); *United States v. Miranti,* 253 F.2d 135, 139–40 (2d Cir.1958). A defendant's testimony in a pretrial suppression hearing may not be used against him at the trial on the merits because allowing its use would force the defendant to choose between two constitutional rights—the right to have unconstitutionally obtained evidence suppressed and the right against self-incrimination. *Simmons v. United States,* 390 U.S. 377, 394, 88 S.Ct. 967, 976, 19 L.Ed.2d 1247 (1968); *United States v. Ragins,* 840 F.2d 1184, 1193 (4th Cir.1988) (testimony at pretrial double jeopardy hearing may not be used against defendant at trial on merits).

not constitute waiver as to later testimony. "Although an incriminating fact usually waives the privilege as to details, *see Rogers v. United States,* 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344 (1951) [parallel citations omitted], waiver does not occur where further disclosure carries a risk of incrimination beyond that raised by the previous testimony." [21] *Femia v. McLaughlin,* 126 F.R.D. 426, 430 (D.Mass.1989) (quoting *United States v. LaRiche,* 549 F.2d 1088, 1096 (6th Cir.), *cert. denied,* 430 U.S. 987, 97 S.Ct. 1687, 52 L.Ed.2d 383 (1977)). "Testimonial waiver" is found only in the most compelling of circumstances. *Klein v. Harris,* 667 F.2d 274, 287 (2d Cir.1981), *overruled on other grounds,* 696 F.2d 186 (2d Cir.1982).

■■■ Christian's statement concerning the phone call to New York does not constitute testimonial waiver under the test enunciated in *Klein v. Harris,* 667 F.2d 274 (2d Cir. 1981).[22] Assuming, *arguendo,* that the suppression hearing and the trial are the same proceeding for Fifth Amendment waiver purposes, Christian's testimony at the hearing did not waive his Fifth Amendment rights because (i) the Court is satisfied that Christian inadvertently (and briefly) described the telephone call without an appreciation that he might be waiving his Fifth Amendment rights and thus "opening the door," (ii) the jury will not be left with an incomplete impression of the call to New York if all they have is the transcript of Christian's hearing testimony, and (iii) any further testimony

Christian might give concerning that telephone call would be likely to further incriminate him. Thus, defendants' motion to compel Christian to testify is DENIED.

### C. Motion to Unseal PSIs

Defendants request production of Christian's Deair's and Faulkner's PSIs on the ground that these confidential reports contain valuable impeachment information.[23] *See United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985); *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The government has supplied those documents to the Court for its *in camera* review to determine whether they contain any *Brady* or *Giglio* [24] material.[25] The Court has concluded that, with the exception of information already provided to the defense, the PSIs contain no information to which defendants are entitled.

■■■ The Due Process Clause and the Confrontation Clause protect a defendant's right to question adverse witnesses. Evidence that is material to the impeachment of a prosecution witness is subject to disclosure under the Due Process Clause. *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). The Confrontation Clause guarantees the opportunity for effective cross-examination.[26]

---

**21.** The *Femia* Court cited the following cases in support of this proposition: *United States v. Seavers,* 472 F.2d 607, 610–11 (6th Cir.1973); *In re Master Key Litigation,* 507 F.2d 292, 294 (9th Cir.1974).

**22.** That test is as follows:

[A] court should only infer a waiver of the fifth amendment's privilege against self-incrimination from a witness' prior statements if (1) the witness' prior statements have created a significant likelihood that the finder of fact will be left with and prone to rely on a distorted view of the truth, and (2) the witness had reason to know that his prior statements would be interpreted as a waiver of the fifth amendment's privilege against self-incrimination.

667 F.2d at 287. This test was developed in the context of testimonial waiver in the same judicial proceeding. *Id.*

**23.** This motion also requested release of any psychiatric reports made about any government witnesses. The government represented that, to the best of its knowledge, no such records exist. That portion of the motion, therefore, is moot.

**24.** The Fourth Circuit has held that PSIs are not in the possession of the prosecutorial arm of the government for purposes of the Jencks Act. *United States v. Bourne,* 743 F.2d 1026, 1032 (4th Cir.1984).

**25.** The government objected to this procedure.

**26.** The defendant is not entitled to "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985) (emphasis in original) (per curiam); *see also United States v. Owens,*

The Due Process Clause requires that the government "turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment." *Pennsylvania v. Ritchie*, 480 U.S. 39, 57, 107 S.Ct. 989, 1001, 94 L.Ed.2d 40 (1987). Impeachment evidence is material when the credibility of a government witness may be determinative of guilt or innocence. *United States v. Starusko*, 729 F.2d 256, 260 (3d Cir.1984). "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Ritchie*, 480 U.S. at 57, 107 S.Ct. at 1001 (quoting *United States v. Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383).

The government correctly argues that a confidential report, such as a PSI, is not a document to which a defendant is automatically entitled once he claims that the document contains exculpatory or impeachment information. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 57, 107 S.Ct. 989, 1001, 94 L.Ed.2d 40 (1987); *United States v. Figurski*, 545 F.2d 389, 391 (4th Cir.1976). The appropriate procedure to follow when a defendant requests production of a confidential record is for the Court to review the document *in camera* to determine whether it contains any material exculpatory or impeachment information. *Ritchie*, 480 U.S. at 58 & n. 15, 107 S.Ct. at 1001 & n. 15 (citing *United States v. Bagley*, 473 U.S. 667, 682–83, 105 S.Ct. 3375, 3383–84, 87 L.Ed.2d 481 (1985)); *Figurski*, 545 F.2d at 392. "Defense counsel has no constitutional right to conduct his own search of the State's files to argue relevance." *Ritchie*, 480 U.S. at 59, 107 S.Ct. at 1002.[27]

Defendants' motion will be denied because none of the information in the PSIs is material to guilt or punishment or might effectively impeach a key government witness.[28] The one portion of Faulkner's PSI that contained a direct quotation has already been produced to defendants.

This motion is, therefore, DENIED.

### D. *Motion Concerning Christian's False Statements*

The government withdrew Christian's plea agreement after concluding that Christian had falsely attempted to implicate the defendants in another crime. By order of this Court, the government provided the defendants with a letter describing the false information that Christian had supplied. Defendants have now orally requested the Court to hold a full hearing at which government agents would testify about the details of those false statements and their investigations of them.

Defendants cite Federal Rule of Criminal Procedure 11(e)(6), which provides that a statement made in the course of any plea negotiations or in proceedings relating to a plea of guilty which is later withdrawn is inadmissible against that defendant at trial. An exception is made, however, "in any proceeding wherein another statement made in the course of the same plea or plea discussions has been introduced and the statement ought in fairness be considered contemporaneously with it." Defendants contend that the exception applies. The Court disagrees.

In particular, defendants make three arguments. First, Christian's statements on audio and video tape form part of his plea agreement with the government. Therefore, Christian's other statements—including the false attempt to implicate the defendants in another murder—fall within the scope of the exception and must be produced. Second, Christian's statements on audio and video tape constitute "testimony" against them, which entitles the defendants to all Chris-

---

484 U.S. 554, 559, 108 S.Ct. 838, 842, 98 L.Ed.2d 951 (1988).

**27.** Defense counsel argued that the Court is incapable of effectively evaluating the exculpatory and impeachment potential of information contained in the PSIs and that defendants, therefore, are entitled to their production. This position has been rejected by the Supreme Court in the very case on which defendants rely. *Ritchie*, 480 U.S. at 59–60, 107 S.Ct. at 1002–1003.

**28.** Additionally, defendants possess ample information with which they can impeach the cooperators, specifically their plea agreements.

tian's statements. Finally, the jurors who evaluate the video and audio tapes should in fairness know that Christian falsely attempted to implicate the defendants in another crime.

The Court concludes that Christian's false statements implicating the defendants in another murder are not discoverable through an evidentiary hearing. First, the Court finds that Christian's statements on audio and video tape do not constitute part of his plea agreement with the government. Indeed, Christian testified that when he agreed to meet with the defendants in the bugged room at the Days Inn, the Baltimore City police told Christian only that the prosecution would be informed of his cooperation. No plea discussions or negotiations had yet occurred. Thus, the tapes made at the Days Inn cannot be construed as part of any plea agreement. Second, while Christian's statements on the tapes will be heard by the jury, they will not be introduced into evidence. The Court will instruct the jury that Christian's statements are to be considered by them only insofar as they provide the context for defendants' statements.[29] Finally, the Court agrees that in fairness the jury is entitled to know that Christian was cooperating with the government at the time the tapes were made at the Days Inn. The Court will instruct the jurors that they must consider this fact when assessing the weight of the audio evidence.

The Court has not yet decided whether due process requires that the jury know about Christian's subsequent false statements. Even if the Court does decide to inform the jury, the defendants are not, therefore, entitled to conduct a "fishing expedition" into this collateral issue.[30]

Defendants' motion, therefore, is DENIED.

E. *Motion for Government to Turn Over Exculpatory Evidence*

This motion is a request for exculpatory evidence in the possession of the government, pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). At the hearing on the pending motions, the government represented that it has given all *Brady* materials to defendants. Contrary to defendants' assertions, this Court has no obligation to review the government's files to determine whether all *Brady* evidence has been produced when the Court has received assurances from the government that all material exculpatory evidence has been produced. *United States v. Holmes*, 722 F.2d 37, 41 (4th Cir.1983).

Defendants' motion, therefore, is DENIED.

F. *Motion for Production of Proffer Notes*

Defendants seek production of proffer session notes pursuant to the Jencks Act, 18 U.S.C. § 3500, *Brady, Giglio,* and *Agurs.* The government, which objected to the procedure, supplied the Court with copies of notes taken during interviews of Deair, Faulkner, and Acheampong for the Court's *in camera* review. This Court has made that review and concludes that none of these notes is discoverable by defendants. The notes contain no discoverable exculpatory or impeachment information. The notes are also not producible under the Jencks Act, which requires production of "statements" made by a government witness that relate to the subject matter of his testimony on direct examination. 18 U.S.C. § 3500(b).[31] The

---

**29.** *See United States v. McClain,* 934 F.2d 822, 832–33 (7th Cir.1991); *United States v. Davis,* 890 F.2d 1373, 1379–80 (7th Cir.1989), *cert. denied,* 493 U.S. 1092, 110 S.Ct. 1165, 107 L.Ed.2d 1068 (1990); *United States v. Gutierrez–Chavez,* 842 F.2d 77, 81 (5th Cir.1988); *United States v. Murray,* 618 F.2d 892, 900 (2d Cir.1980); *United States v. Ariza–Ibarra,* 605 F.2d 1216, 1224 (1st Cir.1979), *cert. denied,* 454 U.S. 895, 102 S.Ct. 392, 70 L.Ed.2d 209 (1981).

**30.** As stated herein, the prosecution will not call Christian as a witness. Thus, defendants are

seeking to impeach a witness they themselves intend to call.

**31.** Even if this motion were timely under the Jencks Act, it would be DENIED. The Jencks Act requires production of the following "statements" if they relate to the substance of the witness' testimony on direct examination:

(1) a written statement made by said witness and signed or otherwise adopted or approved by him; [or]

notes do not contain verbatim or essentially verbatim statements of the witnesses. They contain the thoughts and other work product of the government attorneys.

Accordingly, defendants' motion for production of notes taken by government agents during proffer sessions with co-conspirators is DENIED.

## III. CONCLUSION

For the reasons stated above, defendants' motion to suppress the audio and video tapes at the Days Inn is hereby DENIED; defendants' motion to compel production of Christian's, Deair's, and Faulkner's PSIs is hereby DENIED; defendants' motion to compel production of exculpatory evidence is hereby DENIED; defendants' motion to compel production of the government's proffer notes is hereby DENIED; defendants' motion to compel the government to reveal the precise content of Christian's false statements is hereby DENIED; and defendants' motion to compel Christian to testify on the ground that he waived his Fifth Amendment privilege against self-incrimination is hereby DENIED.

IT IS SO ORDERED.

---

(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement.

18 U.S.C. § 3500(e). All of the notes at issue in this case are summaries written by the agent(s) and attorney present at each interview. They were not adopted by the witnesses and contain no verbatim or essentially verbatim statements made by the witnesses. Such summaries are generally recognized not to be witness "statements" within the meaning of the Jencks Act. See United States v. Williams, 962 F.2d 1218, 1224–25 (6th Cir.), cert. denied, —— U.S. ——, 113 S.Ct. 264, 121 L.Ed.2d 194 (1992); United States v. Lindell, 881 F.2d 1313, 1325–26 (5th Cir.1989), cert. denied, 493 U.S. 1087, 110 S.Ct. 1152, 107 L.Ed.2d 1056 (1990); United States v. Padin, 787 F.2d 1071, 1077–78 (6th Cir.), cert. denied, 479 U.S. 823, 107 S.Ct. 93, 93 L.Ed.2d 45 (1986); United States v. Merida, 765 F.2d 1205, 1214–16 (5th Cir.1985).