UNITED STATES of America

v.

**Qubilah Bahiyah SHABAZZ.**

No. 4–95–CR–3.

United States District Court,
D. Minnesota,
Fourth Division.

April 27, 1995.

---

Scott F. Tilsen, Daniel Martin Scott, U.S. Public Defenders Office, Larry Burton Leventhal, Leventhal Law Office, Minneapolis, MN, William M. Kunstler, Kunstler & Kuby, Percy E. Sutton, Sutton Law Office, New York City, for Qubilah Bahiyah Shabazz.

Toni A. Beitz, Sr. Asst. Co. Atty., Hennepin Cty. Atty., Minneapolis, MN, for County of Hennepin.

Jeanne J. Graham, U.S. Atty. Office, Minneapolis, MN, for the U.S.

## ORDER

ROSENBAUM, District Judge.

The government and the defendant have filed timely objections to the Report and Recommendation issued April 11, 1995, by the Honorable Franklin L. Noel, United States Magistrate Judge. The objections are filed, pursuant to Local Rule 72.1(c)(2).

The Magistrate recommended that defendant's motion to dismiss the indictment be denied; that defendant's motion for a hearing to dismiss the indictment based on outrageous government conduct be denied; that defendant's motion for a change of venue be denied; that defendant's motion to suppress eyewitness identifications be denied as moot; that defendant's motion to suppress intercepted wire or oral communications be denied; that defendant's motion to suppress evidence obtained as a result of search and seizure be denied; and that defendant's motion to suppress statements, admissions, and answers be granted.

The Court received the submissions of the parties and heard oral argument on April 24, 1995. Based on a *de novo* review of the record, the Court adopts the Recommendations of the Magistrate Judge in all but two respects. The Court now determines that the September 6, 1994, audio and video recordings made in the Holiday Inn Express Hotel in St. Paul, Minnesota, must be suppressed. Further, the Court determines that defendant's motion to suppress her December 20, 1994, statement is denied.

## I. *Hotel audio and video recordings*

On September 6, 1994, Michael Fitzpatrick, the government informant, using government-supplied funds, rented a hotel room for Ms. Shabazz.[1] The room was to be the defendant's and her young son's temporary residence upon her arrival in Minneapolis, Minnesota, from New York, New York. Mr. Fitzpatrick gave his consent to have the room wired for audio and video recordation. The monitoring devices were in the next room and were controlled by federal investigative agents. No recordings were made by body microphone.

According to the government, the recording device was deactivated when Mr. Fitzpatrick was absent from the room. There is no evidence suggesting that the agents were formally instructed to minimize their intrusion when Mr. Fitzpatrick was out of the room, nor was there evidence of a log of his comings and goings. The government did not apply to the Court for authorization to intercept audio or visual communications in the hotel room either by way of search warrant or under the authority of 18 U.S.C. §§ 2516(1)(c) or 2518.

■ The defendant seeks to suppress both the audio and video records of matters occurring in the hotel room. She argues that, however temporary, the hotel room was her home, and she was entitled to a reasonable expectation of privacy while she occupied it. The defendant further argues that even though Fitzpatrick paid the room rental, he had no right to consent to surveillance.

The government opposes suppression, citing *United States v. Yonn*, 702 F.2d 1341 (11th Cir.1983), *United States v. Laetividal–Gonzalez*, 939 F.2d 1455 (11th Cir.1991), and *United States v. Cox*, 836 F.Supp. 1189 (D.Md.1993). The defendant relies upon *United States v. Padilla*, 520 F.2d 526 (1st Cir.1975) and the Court's discussion in *Cox*.

■ The audio and video tapes made in the hotel room will be suppressed. While it is the law that the Fourth Amendment protects people, not places, *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), it is a fact that people occupy those places. And the most respected of all places is an individual's abode. *Payton v. New York*, 445 U.S. 573, 601, 100 S.Ct. 1371, 1387, 63 L.Ed.2d 639 (1980).[2] In this case, the government's intrusion into the defendant's rented home is so massive and unregulated as to require the suppression of its product.

In *United States v. Padilla*, the United States Court of Appeals for the First Circuit suppressed a recorded audio statement where an undercover agent rented a hotel room to be used by the defendant. Recording devices were planted in the room and controlled from a remote location. The room was occupied as the defendant's temporary home. *Padilla*, 520 F.2d at 527. The government claimed it did not record when the consenting undercover agent was absent. *Id.* The First Circuit rejected the government's argument that surveillance was constitutionally permitted since it recorded only when the consenting agent was present. The Court concluded that "[w]hen one's confidante leaves his premises, he is left with an

---

1. The room was rented under the name Michael Summers, an alias used by Mr. Fitzpatrick.

2. In *Payton*, the Supreme Court illustrated the sanctity and importance of the home to the common law concept of ordered liberty, by quoting the address of William Pitt to the English House of Commons in March, 1763.

"The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter—all his force dares not cross the threshold of the ruined tenement!" *Payton*, 445 U.S. at 601, n. 54, 100 S.Ct. at 1388, n. 54.

expectation of privacy in his surroundings which is not only actual but justifiable[.]" *Id.* (citing *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). The recordings were suppressed.

A peripatetic informant can wear a body transmitter wherever he chooses. When the body-transmitting informant stands before his subject, the speaker impliedly consents to the hearer doing as he will with the spoken words. The speaker naturally assumes that the hearer will protect the exchanged confidences, but bears the penalty if the hearer is perfidious. *See Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966).

The emplacement of continuously operable transmission and recording devices is not the same as a conversation with a wired informant. When a conversant knows that the hearer is present, the information is freely given and the speaker bears the risk. On the other hand, if microphones and cameras are hidden in one's home and are operable even in the absence of the informant, then Big Brother is literally within the walls. Even if the devices are turned off when the informant is absent, the government, at its whim and ungoverned discretion, retains the *capacity* to invade the occupant's room. The government's option to surveil continues, even in the absence of the implicit consent shown when speaking to another person.

The First Circuit's analysis was rejected in *United States v. Yonn,* 702 F.2d 1341 (11th Cir.1983). The *Yonn* court declined to differentiate between a body microphone and one emplaced in a wall. The Eleventh Circuit found that the location of the recording device did not determine the defendant's reasonable expectation of privacy in his hotel room. *Yonn,* 702 F.2d at 1347. In the Eleventh Circuit's view, "a constitutionally protected expectation of privacy does not attach to a 'wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it.'" *Id.* (citing *Hoffa v. United States,* 385 U.S. 293, 302, 87 S.Ct. 408, 413, 17 L.Ed.2d 374 (1966)).

The Court finds that *Padilla* is better reasoned. Its reasoning, plus the government's retained capacity to intrude, compels the Court's decision. Here, the government did not seek a warrant. The government declined to outfit its informant with a body microphone. There was no exigent circumstance; the alleged plot had been in the planning for months. The putative victim was at no risk; the presumed executioner was the government's informant.

The defendant arrived in Minnesota with her minor child. Mr. Fitzpatrick lured her as both an alleged conspirator and apparently under the guise of marriage. Her presumed life companion gave her the room in which she would sleep. On these facts, the Court determines that the defendant had an expectation of privacy in her surroundings. Ms. Shabazz's expectation was not only actual, but justifiable. *Padilla,* 520 F.2d at 527.

The conclusion reached today is supported by the discussion, and caveat, in *United States v. Cox,* 836 F.Supp. 1189 (D.Md.1993). In denying suppression in that case, Judge Legg recognized that:

> [C]landestine video surveillance of a private room is intrusive and that the law generally requires the approval of a neutral judicial officer before the police may wiretap, search, or bug a room. The 'consent of one of the parties' exception creates a large exception to this rule. Under different facts, the Court might find that the intrusion so great as to be constitutionally impermissible.

*Cox,* 836 F.Supp. at 1199.

The Court finds that this is such a case. Here, Mr. Fitzpatrick had no right to consent to the placement of recording devices in Ms. Shabazz's room. The government had no warrant or judicial supervision. The government was free to surveil at will and was not constricted when the informant was gone, except by the investigator's presumed discretion. The recordings are properly suppressed. The government could have minimized this massive intrusion by obtaining a warrant, or even by being constrained by a minimization instruction or order. The failure to take these steps is fatal under the Fourth Amendment.

## II. *Confession*

The Magistrate recommended suppression of the defendant's December 20, 1994, written statement. The defendant claimed the government violated her rights under the Fourth and Fifth Amendments. The statement was made within the apartment she rented after moving from her temporary home in the hotel. The apartment was occupied by the defendant and her minor child.

On December 20, 1994, two plain clothes FBI agents went to the defendant's apartment building. The agents had no search warrant. The agents avoided using the security buzzer, preferring to wait until they could be admitted by a tenant or visitor. Their effort to avoid the security system was successful when the defendant came into the lobby to check her mail. When the defendant opened the security door, the agents followed her inside the apartment's common hallway.

The agents did not immediately recognize Ms. Shabazz. The defendant asked the agents if they belonged inside. One of the agents recognized her voice from previous surveillance recordings and asked the defendant if she was Qubilah Shabazz. The defendant indicated she was. The agents did not identify themselves or show official credentials, but simply told the defendant they were there to speak with her.

The defendant proceeded down the common hallway with the agents. The defendant opened her door, left it open, and went inside. The agents followed inside a few steps and identified themselves as FBI agents. According to the agents, the defendant became visibly agitated. The agents told the defendant she was not under arrest and that they wanted to talk with her about Mr. Fitzpatrick. The defendant calmed down and met with the agents for two hours. No *Miranda* warning was given.

During the course of the interview, one of the agents prepared a statement for the defendant's signature. After changes were made in the draft, by and with the defendant's assent, she signed the document. On December 22, 1994, one of the agents and a third FBI agent returned to the apartment. The agents were buzzed through the security door by Ms. Shabazz and were admitted into her apartment. This time, the agent advised the defendant that she should secure counsel and contact the United States Attorney's Office.

■ The Magistrate determined that the statement should be suppressed, finding that the agents' entry violated the Fourth Amendment and that the statement was the fruit of the wrongful entry. The government argues that no Fourth Amendment violation occurred, as the defendant's conduct implied her consent and the statement was voluntarily given. The defendant supports the Magistrate's recommendation, and further argues that the statement should be suppressed under the Fifth Amendment.

■ The Court finds no Fourth Amendment violation, as the defendant consented to the agents' entry into her apartment. "An invitation or consent to enter a house may be implied as well as expressed." *United States v. Turbyfill*, 525 F.2d 57, 59 (8th Cir.1975). The opening of a door can constitute the implied invitation to enter. *Id.*

Here, the defendant voluntarily left her door open for two unidentified persons to enter. The strangers had directly indicated they wished to speak to her. After receiving Ms. Shabazz's implied gesture of "invitation or consent to enter," they crossed the portal of the apartment. Once they had entered, and virtually immediately thereafter, the agents displayed their FBI credentials and identified themselves. The agents did not display weapons. The agents told Ms. Shabazz that she was not under arrest. She was in her own apartment and was free to move about and was able to use her phone.[3] Ms. Shabazz was not given the full Miranda warning, but none was required, as she was

---

**3.** Defendant's counsel suggests that Ms. Shabazz was in custody since one of the agents kept visual contact with Ms. Shabazz when she moved from room to room and received a telephone call. The suggestion is unavailing. Visual contact served to protect the agents from danger should the defendant have attempted to obtain a weapon. An agent's prudent self-protection does not create a custodial setting.

not in custody during the discussion. She was not taken into custody at the conclusion of questioning. *See United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir.1990) (indicia of custody outlined in six part test).

■ No Fourth Amendment violation occurred when the agents deliberately circumvented the building's security door, as defendant had no reasonable expectation of privacy in the common hallway. *United States v. McGrane*, 746 F.2d 632, 634 (8th Cir.1984); *United States v. Eisler*, 567 F.2d 814, 816 (8th Cir.1977).

■ The agent's entry into the apartment, itself, was not unlawful. Defendant admitted the agents into her home with no knowledge of their police authority. She simply opened the door to two strangers who indicated an interest in speaking to her. Even if agents employ a false identity—and here their identity was wholly undefined—voluntary admission permits an agent to enter private premises to gather information. *United States v. Wagner*, 884 F.2d 1090, 1094–95 (8th Cir. 1989). The Eighth Circuit has determined that one who consents to an undercover agent's entry into his or her home has no legally enforceable expectation that the agent is not an undercover police agent. *Id.*

The Magistrate relied on *United States v. Shaibu*, 920 F.2d 1423 (9th Cir.1990) to support his Fourth Amendment analysis. The Court finds *Shaibu* to be inapposite. In *Shaibu*, four police officers went to an apartment building without a warrant. After entry into the common hallway, the officers encountered the defendant. One of the officers explicitly identified himself as a police officer and asked if the suspect was in the apartment. *Shaibu*, 920 F.2d at 1424.

The critical distinction between *Shaibu* and the present case is that Shaibu knew that police officers were seeking entrance into his apartment. After receiving this information, Shaibu retreated into his apartment leaving the door open. A police officer, by the nature of the officer's implicit power and official status, is inherently coercive.

The Ninth Circuit explicitly declined to find that "merely retreating into one's home while being followed by a police officer can constitute consent to a police entry." *Shaibu*, 920 F.2d at 1425. The Court emphasized that "such conduct, standing alone, is insufficient" to reach such a conclusion. *Id.* The force of police authority was emphasized when the Ninth Circuit explained that:

> [C]oercion is implicit in situations where consent is obtained under color of the badge[.] [W]e interpret failure to object to the police officer's thrusting himself into Shaibu's apartment as more likely suggesting submission to authority than implied or voluntary consent.

*Id.* at 1427 (internal citation omitted). Ms. Shabazz's decision to speak to two strangers—whether wise or not—does not implicate the same coercive concerns. Accordingly, *Shaibu* is inapposite and its analysis is inapplicable.

Ms. Shabazz's consent to permit the agents' entry was clearly implied from the totality of the circumstances. The entry was in accord with the Fourth Amendment. The defendant was not in custody, and her statement was voluntarily given.

III. *Conclusion*

Based upon a *de novo* review of the record herein, the Court adopts, in part, the Magistrate's Report and Recommendation. Accordingly, IT IS ORDERED that:

1. The defendant's motion to suppress the audio and video recordings made in the hotel is granted.

2. The defendant's motion to suppress the December 20, 1994, statement is denied.

3. The Court adopts the remaining portion of the Report and Recommendation.