

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-20-2004

# USA v. Lee

Precedential or Non-Precedential: Precedential

Docket No. 01-1629

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"USA v. Lee" (2004). *2004 Decisions.* Paper 948.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/948

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT

———————

No. 01-1629

———————

UNITED STATES OF AMERICA

v.

ROBERT W. LEE, SR.,
Appellant

———————

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
DISTRICT OF NEW JERSEY

(D. C. Criminal No. 99-640-1)
District Court Judge: John W. Bissell, Jr.

———————

Argued September 20, 2002

Before: SCIRICA, Chief Judge, and
ALITO, and MCKEE, Circuit Judges.

(Opinion Filed: February 20, 2004)

GERALD KROVATIN (argued)
Krovatin & Associates
744 Broad Street, Suite 1901 Newark, NJ
07102

*Counsel for Appellant*

GEORGE S. LEONE
Chief, Appeals Division
MICHAEL MARTINEZ (argued)
Assistant U.S. Attorney
U.S. Department of Justice
970 Broad Street
Newark, NJ 07102-2535

*Counsel for Appellee*

———————

OPINION OF THE COURT

———————

ALITO, Circuit Judge:

This is an appeal by defendant Robert W. Lee, Sr. ("Lee") from a judgment in a criminal case. Lee was indicted on charges stemming from the alleged payment of bribes by boxing promoters to Lee and other officials of the International Boxing Federation ("IBF"). After a jury trial, Lee was convicted of one count of conspiracy to engage in money laundering, in violation of 18 U.S.C. § 1956(h); three counts of interstate travel in aid of racketeering, in violation of 18 U.S.C. § 1952 (the "Travel Act") and 18 U.S.C. § 2; and two counts of filing false tax returns, in violation of 26 U.S.C. § 7206. He was sentenced to a concurrent term of 22 months' imprisonment on each count and was fined $25,000.

In this appeal, Lee argues (1)

1

that video tapes that show him receiving money from a confidential government informant violated his Fourth Amendment rights and should have been suppressed, (2) that the District Court misinstructed the jury concerning the meaning of the "duty of fidelity" under the New Jersey commercial bribery statute, N.J.S.A. 2C:21-10, (3) that his Travel Act and money laundering conspiracy convictions must be reversed because they are predicated upon the New Jersey commercial bribery statute, and there is an insufficient nexus between his conduct and New Jersey to permit the application of the New Jersey statute, (4) that his money laundering conviction should be reversed because the evidence at trial did not prove the existence of a single conspiracy, (5) that two of the Travel Act counts were impermissibly amended at trial, and (6) that the District Court erred when it imposed concurrent sentences of 22 months' imprisonment on the tax counts. We affirm.

## I.

Lee was a cofounder and president of the IBF, an organization that crowns international boxing champions and publishes ratings of boxers within different weight divisions. The ratings are published monthly from the IBF headquarters in East Orange, New Jersey. The primary function of the ratings is to determine which boxers will fight in upcoming IBF championship bouts. During the period relevant to this appeal, Lee served on the IBF Executive Board and various IBF committees, including the championship committee, chaired by Don "Bill" Brennan, and the ratings committee, chaired by C. Douglas Beavers.

In May 1996, the Federal Bureau of Investigation received information that boxing promoters were paying certain IBF officials in order to receive more favorable IBF ratings for their boxers. Beavers was questioned and, in May of 1997, chose to cooperate with the FBI. He told investigators that he had solicited and received bribes from boxing promoters and that these bribes had been divided equally among himself, Brennan, Lee, and Lee's son, Robert W. Lee, Jr. ("Lee, Jr."). Beavers, who is based in Portsmouth, Virginia, further testified that he had held regular telephone conversations with Lee, who works out of the IBF headquarters in East Orange, regarding strategies for maximizing payment amounts, methods for laundering bribes that were received as checks[1], and arrangements for Lee to travel from New

---

[1] Because of the difficulty of transporting large amounts of cash from South America, bribes from South American promoters were sometimes received in the form of checks. These were either hand delivered or mailed to Beavers, who would then deposit the checks into a bank account belonging to the Portsmouth Athletic Club, a gymnasium owned by Beavers. Once the checks had cleared, Beavers would then retain his share and distribute the remainder of the bribe to Lee in the form of cash.

Jersey to Virginia to collect his share of the bribes.

With Beavers' cooperation, the FBI made audio and video recordings of three meetings between Beavers and Lee that took place in Portsmouth, Virginia, on June 9, 1997, December, 18, 1997 and October 21, 1998. The meetings were held in a hotel suite rented by Beavers for Lee in the Portsmouth Holiday Inn and were electronically monitored and recorded using equipment installed in the living room of the suite by the FBI prior to Lee's arrival. This equipment consisted of a concealed camera and microphone that transmitted video and audio signals to a monitor and recorder located in an adjacent room. The FBI did not obtain a warrant authorizing the installation or use of the equipment but instead relied on Beavers' consent. The government agents located in the room next to Lee's suite were instructed to monitor activity in the corridor to determine whether or not Beavers had entered Lee's rooms. The agents were further instructed to switch on the monitor and recorder only when Beavers was in the suite and that, at all other times, the monitor and recorder were to be switched off. During the December 1997 meeting, Beavers was recorded handing Lee cash that had originated as a bribe paid to the IBF's South American representative, Francisco "Pancho" Fernandez, by a Colombian boxing promoter, Billy Chams.

On November 4, 1999, a federal grand jury in the District of New Jersey indicted Lee, Lee, Jr., Brennan and Fernandez on 35 counts related to the receipt of bribes from boxing promoters. As noted, Lee Sr. was convicted on six counts but acquitted on the rest. Lee, Jr. was acquitted on all counts. The case against Brennan was dismissed because of his ill health and age, and Fernandez remains a fugitive outside the United States.

II.

A.

Lee challenges the District Court's admission into evidence of tapes of meetings in his hotel suite. Lee contends that the monitoring and recording of these meetings violated his Fourth Amendment rights because the government did not obtain a warrant. Lee's argument, however, is inconsistent with well-established Fourth Amendment precedent concerning the electronic monitoring of conversations with the consent of a participant.

In United States v. Hoffa, 385 U.S. 293 (1967), a confidential government informant named Partin met with the defendant in the defendant's hotel suite and elsewhere and testified about those conversations at trial. The defendant argued that Partin had conducted an illegal search for verbal evidence and that, because the defendant was unaware of Partin's role as an informant, the defendant had not validly consented to his entry into the suite. Id. at 300. The Supreme Court rejected this argument, holding that the defendant had "no interest legitimately protected by the Fourth Amendment." Id.

3

at 301-02. The Court concluded that the Fourth Amendment does not protect "a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." Id. at 302.

Although Hoffa involved testimony about conversations and not electronic recordings of conversations, the Supreme Court in later cases drew no distinction between the two situations. See United States v. Caceres, 440 U.S. 741, 744 (1979); United States v. White, 401 U.S. 745, 752 (1971) (plurality). As the Court in Caceres put it,

> Concededly a police agent who conceals his police connections may write down for official use his conversations with a defendant and testify concerning them, without a warrant authorizing his encounters with the defendant and without otherwise violating the latter's Fourth Amendment rights. Hoffa v. United States, 385 U.S., at 300-303. For constitutional purposes, no different result is required if the agent instead of immediately reporting and transcribing his conversations with defendant, either (1) simultaneously records them with electronic equipment which he is carrying on his person; (2) or carries radio equipment which simultaneously transmits the conversations either to recording equipment located elsewhere or to other agents monitoring the transmitting frequency . . . .

440 U.S. at 750-51 (quoting United States v. White, 401 U.S. 745, 749 (1971)) (citation omitted)). The Court added that it had "repudiated any suggestion that [a] defendant had a 'constitutional right to rely on possible flaws in the agent's memory, or to challenge the agent's credibility without being beset by corroborating evidence that is not susceptible of impeachment.'" Id. at 750 (quoting Lopez v. United States, 373 U.S. 427, 439 (1963)). In short, the Court adopted the principle that, if a person consents to the presence at a meeting of another person who is willing to reveal what occurred, the Fourth Amendment permits the government to obtain and use the best available proof of what the latter person could have testified about. This principle appears to doom Lee's argument here.

Lee argues, however, that neither the Supreme Court nor our court has extended this principle to the circumstances present in this case. He points to three factors: (1) the agents used video rather than audio equipment; (2) the recording occurred in Lee's hotel room, a place where a person has a heightened expectation of privacy; and (3) the monitoring equipment remained in the room when Beavers was not present.

4

In making this argument, Lee relies on the First Circuit's decision in United States v. Padilla, 520 F.2d 526, 527-28 (1st Cir. 1975), which held that the defendant's Fourth Amendment rights were violated when agents placed an audio recording device in the defendant's hotel room and recorded conversations between the defendant and another person who consented to the recordings. In reaching this conclusion, the First Circuit expressed concern that if law enforcement officers were permitted to leave a monitoring or recording device in a hotel for a lengthy period of time the officers would be tempted to monitor or record conversations that occurred when no consenting participant was present. Id. As the Court put it,

> [t]he government's position would turn on its head the carefully tailored [consenting party] exception to . . . one's expectation of privacy. Electronic devices could be installed for lengthy periods of time without antecedent authority, so long as only a suspect's conversations with police agents were offered in evidence and the enforcement officials alleged that nothing else was recorded. Under this approach a room or an entire hotel could be bugged permanently with impunity and with the hope that some

usable conversations with agents would occur.

Id. at 528. See also United States v. Shabazz, 883 F.Supp. 422 (D.Minn. 1995) (audio and video recording).

In contrast to the First Circuit, the Second and Eleventh Circuits have held that the Fourth Amendment is not violated by the use of a fixed electronic device to record a meeting between a defendant and a person who consents to the recording. United States v. Yonn, 702 F.2d 1341, 1346-47 & n. 5 (11th Cir. 1983); United States v. Myers, 692 F.2d 823 (2d Cir. 1982). In Myers, a defendant was videotaped during a meeting with a government informant at a townhouse maintained by the FBI. Id. at 832. Rejecting the defendant's Fourth Amendment argument, the Court stated that the defendant's "conversations with undercover agents in whom he chose to confide were not privileged, and mechanical recordings of the sights and sounds to which the agents could have testified were proper evidence." Id. at 859.

In Yonn, the Eleventh Circuit likewise held that the Fourth Amendment was not violated when agents placed a microphone in a motel room and monitored and recorded the defendant's conversations when a person who consented to the surveillance was present. The Court held that "[t]he location of the electronic equipment does not alter the irrefutable fact that Yonn had no justifiable expectation of privacy in his

5

conversation with [the person who consented]." 702 F.2d at 1347. The Court also specifically rejected the reasoning of Padilla, stating that it saw "no reason to suppress the recording of a clearly unprotected conversation merely because the monitoring technique employed poses a hypothetical risk that protected conversations may be intercepted." Id. at 1347 n.5.

We have considered the concern expressed by the Padilla Court, but we remain convinced that the present case is governed by the well-established principle that a person has no legitimate expectation of privacy in conversations with a person who consents to the recording of the conversations. None of the three factors on which Lee relies appears to us to be sufficient to take this case beyond the reach of this principle.

First, we cannot distinguish this case on the ground that the recorded meetings occurred in a hotel suite. What is significant is not the type of room in which the surveillance occurred but Lee's action in admitting Beavers to the room. Although Lee had an expectation of privacy in the hotel suite so long as he was alone there, when Lee allowed Beavers to enter, any expectation of privacy vis-a-vis Beavers vanished. We note that in Hoffa many of the conversations also occurred in a hotel suite, but the Court nevertheless held that the case did not involve any legitimate Fourth Amendment interest. 385 U.S. at 296.

Second, we cannot draw a constitutional distinction between consensual audio and video surveillance. The principle underlying the governing Supreme Court cases is that if a defendant consents to the presence of a person who could testify about a meeting and is willing to reveal what occurs, the defendant relinquishes any legitimate expectation of privacy with respect to anything that the testimony could cover. Thus, just as Lee gave up any expectation of privacy in the things that he allowed Beavers to hear, Lee also gave up any expectation of privacy in the things that he allowed Beavers to see. Although video surveillance may involve a greater intrusion on privacy than audio surveillance, the difference is not nearly as great as the difference between testimony about a conversation and audio recordings of conversations. As noted, however, the Supreme Court has not drawn any distinction between those two types of evidence, and we similarly see no constitutionally relevant distinction between audio and video surveillance in the present context.

Finally, we do not agree with the First Circuit that it is appropriate to suppress recordings of meetings between a defendant and a cooperating individual simply because the recording device was placed in the room rather than on the cooperating individual's person. To be sure, there are three circumstances in which this distinction would matter for Fourth Amendment purposes. First, if the defendant had an expectation of privacy in the premises at the time when the device was installed, the entry to install the device

6

would constitute a search. Second, the cases involving consensual monitoring do not apply if recordings are made when the cooperating individual is not present. Third, the logic of those cases is likewise inapplicable if the placement of the recording device permits it to pick up evidence that the cooperating individual could not have heard or seen while in the room. Unless one of these circumstances is present, however, it does not matter for Fourth Amendment purposes whether the device is placed in the room or carried on the person of the cooperating individual. In either event, the recording will not gather any evidence other than that about which the cooperating witness could have testified.

As the government argues, the decision in Padilla appears to be based, not on the conclusion that the recordings in that case had been obtained in violation of the Fourth Amendment, but on a prophylactic rule designed to stamp out a law enforcement technique that the Court viewed as creating an unacceptable risk of abuse. Even assuming for the sake of argument that we have the authority to adopt such a rule[2], however, we would not do so. Although Padilla was decided more than a quarter century ago and has not been followed in any other circuit, we are not aware of evidence that the installation of recording devices to monitor meetings attended by a cooperating individual has led to the sort of abuse that the Padilla

---

[2]But see United States v. Payner, 447 U.S. 727, 735-36 & n.8 (1980).

Court feared. Nor is it intuitively obvious that there is much risk of such abuse. As noted, the Padilla Court feared that law enforcement agents would install electronic devices in a hotel rooms and monitor what occurred "in the hope that some usable conversations with agents would occur." 520 F.2d at 527-28. However, there are numerous reasons to doubt whether law enforcement is likely to find this an alluring strategy.

First, a person who illegally intercepts wire, oral, or electronic communicates is subject to criminal and civil penalties, see 18 U.S.C. §§ 2511, 2520, and a federal agent who violates the Fourth Amendment may be sued under Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971). Second, in order to install a monitoring device, law enforcement authorities or a person cooperating with them must acquire a right to enter the premises, such as by obtaining a warrant or renting the premises in which the device is to be installed. Thus, the Padilla Court's fear that agents might bug "an entire hotel," 520 F.2d at 528, and the fear of the District Court in Shabazz that devices could be placed in a person's home, see 883 F.Supp. at 425, seem misplaced. Third, it is not clear that law enforcement would have much to gain from monitoring conversations that occur when a cooperating individual is not present. A video tape of a conversation generally reveals whether a cooperating individual is present, and without proof of the presence of the cooperating individual, the tape is inadmissible. We do not go so

7

far as to say that there is no risk of the type of abuse that worried that Padilla Court, but the risk is not great enough to justify the holding of the Padilla Court.

In the present case, there was no violation of Lee's Fourth Amendment rights. The monitoring devices were installed in the suite's living room at a time when Lee had no expectation of privacy in the premises. There is no evidence that conversations were monitored when Beavers was absent from the room, and Beavers was plainly there at the time of the incriminating meetings shown on the tapes that were introduced at Lee's trial. We are satisfied that the tapes do not depict anything material that Beavers himself was not in a position to hear or see while in the room. Finally, we reject Lee's suggestion that the government was required, before resorting to video surveillance, to demonstrate that less intrusive investigative techniques were unlikely to succeed. Although this requirement applies to monitoring governed by the federal wiretapping statute, 18 U.S.C. § 2518(3)(c), that statute does not apply to electronic surveillance conducted with the prior consent of a party to the communication. Similarly, judicial decisions considering a similar requirement in cases involving silent video surveillance conducted without a participant's consent, see United States v. Williams, 124 F.3d 411, 416 & n.5 (3d Cir. 1997), are inapplicable in this context. We therefore reject Lee's argument that the tapes should have been suppressed.

B.

Lee next contends that the District Court misinstructed the jury regarding the elements of commercial bribery under the New Jersey Commercial bribery statute, N.J.S.A. § 2C:21-10, which figured in four of the counts on which Lee was convicted, i.e., the three counts of interstate travel in aid of racketeering and the money laundering conspiracy count.[3] Our "[r]eview of the legal standard enunciated in a jury instruction is plenary," United States v. Yeaman, 194 F.3d 442, 452 (3d Cir. 1999), "but review of the wording of the instruction, *i.e.,* the expression, is for abuse of discretion." Id. "This Court reviews jury instructions to determine whether, 'taken as a whole, they properly apprized the jury of the issues and the

---

[3]The Travel Act counts charged that he traveled in interstate commerce with the intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of commercial bribery in violation of the New Jersey bribery statute. The relevant part of the money laundering conspiracy count charged that Lee and the other alleged conspirators conspired to commit the offense of engaging in financial transactions involving proceeds derived from violations of the New Jersey commercial bribery statute while knowing that these proceeds were derived from such violations and that the financial transactions were designed at least in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds.

8

applicable law.'" Id. (quoting Dressler v. Busch Entertainment Corp., 143 F.3d 778, 780 (3d Cir. 1998)).

The New Jersey commercial bribery statute provides in relevant part as follows:

> A person commits a crime if he solicits, accepts or agrees to accept any benefit *as consideration for* knowingly violating or agreeing to violate *a duty of fidelity* to which he is subject as . . . An officer, director, manager or other participant in the direction of the affairs of an incorporated or unincorporated association.
>
> . . . .

N.J.S.A. § 2C:21-10a (emphasis added).

The District Court instructed the jury that the three elements needed in order to establish a violation of the New Jersey commercial bribery statute are:

> First, that the defendant solicited, accepted or agreed to accept a benefit;
>
> Second, that the defendant did so in consideration for knowingly violating or agreeing to violate a duty of fidelity;
>
> Third, that the defendant owed that duty of fidelity because he is either

an officer, a director, a manager or other participant in the direction of the affairs of an incorporated or unincorporated association.

Joint App. at 3788. This was a straightforward and accurate statement of the elements of N.J.S.A. § 2C:21-10a.

The Court further instructed the jury as to the meaning of a "duty of fidelity," stating:

> A person who owes a duty of fidelity or loyalty may not engage in self-dealing or otherwise use his or her position to further personal interests rather than those of the beneficiary. For example officers and directors have a duty not to engage in self-dealing to further their own personal interests rather than the interests of the corporation.
>
> . . . .
>
> The duty of loyalty or fidelity may also arise based on the existence of a contractual relationship between a defendant such as Mr. Lee, Sr. and the corporation such as the IBF. A contract creates a duty between the contracting parties to adhere to the terms of the contract, and those terms may include or

9

encompass a duty of fidelity. A director or officer's failure to abide by the terms of his contract with a corporation could, if you so find, be a breach of his duty of loyalty to the corporation.

Joint App. at 3790-91.

Pointing to these latter instructions, Lee contends that the District Court erred by telling the jury (1) that a person can breach a "duty of fidelity" merely by engaging in self-dealing and (2) that a breach of an employment contract is a per se breach of a duty of fidelity. We disagree. Lee first argues that the District Court went astray in instructing the jury that any act of self-dealing by a corporate officer constitutes a breach of a duty of loyalty. According to Lee, the New Jersey commercial bribery statute reaches only "those specific duties of the actor 'to which he is subject' as a director, manager, etc. *of the specific corporation at issue, not to generic, vague, undefined corporate duties*, such as a duty to refrain from 'self-dealing.'" Appellant's Br. at 32 (emphasis added). However, Lee cites no New Jersey case law that supports this interpretation of N.J.S.A. § 2C:21-10a; we are not aware of any such authority; and the jury instruction in question seems to be an accurate interpretation of the statutory language. Moreover, in light of the nature of the breach alleged in this case (accepting bribes in exchange for rigging the ratings of boxers) any failure to draw the fine distinction suggested by Lee (between "specific" and "generic" corporate duties) was harmless.

Lee next maintains that the instructions regarding the "duty of fidelity" were flawed because the jury could have interpreted them to mean that proof that he breached this duty was alone sufficient to establish that he violated N.J.S.A. § 2C:21-10a. Lee's argument is not convincing. The Court's discussion of the meaning of a "duty of fidelity" was delivered immediately after its careful explanation of the three elements that were necessary for the jury to convict Lee of violating N.J.S.A. § 2C:21-10a, and one of these elements was that "the defendant [received a benefit] in consideration for knowingly violating or agreeing to violate a duty of fidelity." Joint App. at 3788. Thus, the District Court did not read the element of consideration out of the statute.

Finally, Lee suggests that the District Court told that jury that a breach of contract is per se a breach of a duty of fidelity, Appellant's Br. at 33, but the District Court said no such thing. Rather, the Court said only that a duty of loyalty or fidelity "*may . . . arise* based on the existence of a contractual relationship between a defendant such as Mr. Lee, Sr. and the corporation such as the IBF" and that "[a] director or officer's failure to abide by the terms of his contract with a corporation *could, if you so find, be* a breach of his duty of loyalty to the corporation." Joint App. at 3791

10

(emphasis added). We are convinced that the jury instructions, read in their entirety, "properly apprized the jury of the issues and the applicable law." Yeaman, 194 F.3d at 452.

## C.

Lee next contends that his convictions for interstate travel in aid of racketeering and for conspiracy to engage in money laundering violated his rights to due process.[4] Asserting that those convictions were predicated on violations of the New Jersey commercial bribery statute, Lee argues that "the connections between the conduct underlying [those counts] and the State of New Jersey [were] tenuous at best" and that the application of the New Jersey statute to the conduct at issue would violate due process.[5]

Appellant's Br. at 39. Lee contends that "the vast majority of the conduct constituting 'commercial bribery' took place outside the state of New Jersey in states that either do not consider such conduct a crime, or do not consider it as serious a criminal offense as New Jersey does." Appellant's Br. at 36. He notes that the bribe money was handed to him by

---

[4]At one point in his brief, Lee claims that the application of the New Jersey commercial bribery statute to the conduct charged in the counts at issue also violated his right to the equal protection of the laws, but his brief makes no attempt to explain what this invocation of the Equal Protection Clause adds to his due process argument. We are therefore unable to assess any independent equal protection argument regarding the New Jersey commercial bribery statute.

[5]We understand the question before us to be exclusively one of federal constitutional law, not state law. Specifically, we understand the question to be whether the conduct at issue is sufficiently tied to the State of New Jersey to permit that state to regulate that conduct without violating the federal Constitution. The state-law question of whether the conduct at issue is sufficiently tied to the state to bring the conduct within the scope of the state commercial bribery statute has not been developed in Lee's briefs, and we do not regard that question as before us in this appeal. Lee's brief does refer to the New Jersey statute that specifies the territorial reach of the state's criminal laws, N.J.S.A. 2C1-3, but Lee makes no attempt to argue that the conduct at issue here does not fall within this provision. In particular, Lee does not explain why the conduct at issue in this case does not fall within N.J.S.A. § 2C:1-3a(1), which provides that "a person may be convicted under [New Jersey law] if . . . [e]ither the conduct which is an element of the offense or the result which is such an element occurs within this State." Instead, of addressing this question, Lee's brief quickly notes that this statute "is itself subject to constitutional review where extra-territorial application of New Jersey law would violate the due process clause of the United States Constitution." Appellant's Br. at 38-39.

Beavers in Virginia and that the agreements between Beavers and Fernandez, the IBF's South American representative, were made outside of New Jersey. Lee's arguments are not persuasive.

"Acts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a state in punishing the cause of the harm as if [the defendant] had been present [in the state] at the effect." Strassheim v. Daily, 221 U.S. 280, 284 (1911). See also United States v. Woodward, 149 F.3d 46, 66 (1st Cir. 1998).[6] Cf. Model Penal Code § 1.03.

---

[6]Lee relies on BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996), and Healy v. Beer Institute, Inc., 491 U.S. 324 (1981), but we do not find those cases to be apposite. Pointing to, among other things, the restrictions imposed by the dormant Commerce Clause, the Court in BMW held that a state court's award of punitive damages "must be supported by the State's interest in protecting its own consumers and its own economy." Id. at 572. Lee does not make a make a dormant Commerce Clause argument here, and in any event, BMW does not preclude a state from basing an award of punitive damages on conduct that occurs outside the state but that has a sufficient effect on the state's "own consumers and its own economy." Id.

Healy held that a state law concerning beer prices violated the dormant Commerce Clause. As noted, Lee does not make a dormant Commerce

In this case, both the purpose and the effect of the commercial bribery was to cause the IBF, which has its principal place of business in New Jersey, to alter its rankings of boxers. Thus, the conduct in question had effects within New Jersey: it tended to harm a business headquartered in the state and to produce attendant consequences there. These effects are sufficient to permit the state to regulate the conduct without violating due process.

The First Circuit's decision in United States v. Woodward, supra, supports this conclusion. In Woodward, a member of the Massachusetts Legislature accepted gratuities in Florida and was convicted under the Travel Act of traveling in interstate commerce with the intent to promote the offense of commercial bribery, in violation of the Massachusetts statute. The First Circuit held that the potential effect on Massachusetts when one of its legislators accepts gratuities in another state was sufficient to satisfy the "effects test" set out in Strassheim. 149 F.3d at 67-68.

Lee attempts to distinguish Woodward by arguing that the conduct of the defendant in that case created a potential for harm that was unique to his own state (because he was a member of that state's legislature), whereas the effects of Lee's conduct "were no greater in New Jersey than they were in any other state." Reply Br. at 12. However, the effects

---

Clause argument here, and therefore we do not address that issue.

12

within a state of extraterritorial conduct need not be unique to that state in order to justify the exercise of jurisdiction. The effects need only be of sufficient magnitude, and while the effects-test argument was stronger in Woodward than it is here, the effects here were adequate. Moreover, we note that, contrary to Lee's suggestion, his conduct did create the potential for special harm in New Jersey because that is where the IBF is headquartered and publishes its rankings. We thus hold that Lee's convictions on the counts in question did not violate due process.

## D.

Lee contends that the government failed to prove the existence of a single conspiracy to engage in money laundering, as charged in the indictment,[7] and merely

---

[7] Count 27 of the Superceding Indictment provides, in relevant part:

From in or about December 1990, through in or about November 1997, in the district of New Jersey, and elsewhere, defendant ROBERT W. LEE, SR., and separately charged Don Brennan, a/k/a/ "Bill", and separately charged Francisco Fernandez, a/k/a/ "Pancho," a/k/a "Pacho," and others conspired to violate Title 18, United States Code, Section 1956(a)(1), that is, knowing that the property involved in financial transactions represented the proceeds of some form of unlawful activity, conducted and attempted to conduct financial transactions, which in

proved the existence of a series of unrelated conspiracies between different boxing promoters and individual officers of the IBF. Lee argues that his conviction for conspiracy to engage in money laundering should therefore be reversed. We reject this argument.

We exercise plenary review over "whether there was sufficient evidence from which the jury could have concluded that the government proved the single conspiracy alleged in the indictment." United States v. Kelly, 892 F.2d 255, 258 (3d Cir. 1989). In reviewing the sufficiency of the evidence after conviction, we must view the evidence in the light most favorable to the verdict. Id. Where a single conspiracy is alleged in an indictment, and the evidence at trial merely proves the existence of several distinct conspiracies, there is an impermissible variance. Id. On the other hand, "a finding of a master conspiracy with sub-schemes does not constitute a finding of

---

fact, involved the proceeds of specified unlawful activity, namely, bribery, contrary to N.J.A.C. §§ 2C:21-10(a)(4) and 2C:21-10(b).

. . . .

b. knowing that the transaction was designed in whole and in part to disguise the nature, location, source, ownership and control of the proceeds of specified unlawful activity, namely, bribery, contrary to N.J.A.C. §§ 2C:21-10(a)(4) and 2C:21-11(b).

Joint App. at 120.

13

multiple, unrelated conspiracies and, therefore, would not create an impermissible variance." Id. (quoting United States v. Smith, 789 F.2d 186, 200 (3d Cir. 1986)). In Kelly, we adopted a three-step inquiry to distinguish a single conspiracy from a series of separate, unrelated conspiracies:

> First, we examine whether there was a common goal among the conspirators. Second, we look at the nature of the scheme to determine whether the agreement contemplated bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators. Third, we examine the extent to which the participants overlap in the various dealings.

Id. at 259 (citations and quotation marks omitted).

Application of the Kelly inquiry shows that the jury had a reasonable basis for concluding that what Lee alleges were four separate conspiracies was in fact part of the same overarching conspiracy to launder the proceeds of the bribes paid to Lee and other IBF officials.[8] The first step of the Kelly inquiry is satisfied because Lee, Lee Jr., Brennan and Fernandez shared a common goal, namely, to receive shares of the payments from boxing promoters. The second step in the Kelly inquiry – that the co-conspirators each acted to bring about a continuous result that would not have continued but for their continuing cooperation – is also met because the participants continuously cooperated in their receipt of bribes, in the laundering of checks, and in the distribution of proceeds between themselves. For example, Lee held several conversations with Beavers regarding the risks of receiving bribes in the form of checks, and Beavers deposited checks that he had received from Fernandez into the bank account belonging to the Portsmouth Athletic Club and then distributed part of the proceeds to Lee. Finally, there was sufficient evidence to show that the participants overlapped in the various dealings, in satisfaction of the third Kelly factor. In establishing this third factor, the government is not required to "prove that each defendant knew all the details, goals, or other participants in order to find a single conspiracy." Id. at 260 (internal quotation marks and citations omitted). Evidence was presented at trial that Lee participated in each of the four supposedly separate schemes, Beavers was directly implicated in three[9], and Fernandez was

---

[8] Two of the allegedly separate conspiracies involved payments by Colombian boxing promoters to Fernandez and then to Beavers. The two remaining conspiracies involved direct payments by U.S. boxing promoters to Lee and Beavers.

[9] He either received money from Fernandez or directly from a boxing

14

directly implicated in two.

In sum, there was sufficient evidence, when viewed in the light most favorable to the government, from which the jury could have concluded that there was a single conspiracy, as opposed to a series of unrelated smaller agreements between the participants.

E.

Lee contends that the two of the Travel Act counts of the indictment were improperly amended at trial. We exercise plenary review over a claim that an indictment was impermissibly amended. United States v. Asher, 854 F.2d 1483, 1497-98 (3d Cir. 1988). "In order to rise to the level of an impermissible amendment, a variance must act to modify the indictment so that the defendant is convicted of a crime that involves elements distinct from those of the crimes with which he was originally charged." Id. at 1497. "Thus, where trial evidence [has] amended the indictment by *broadening* the possible bases for conviction from that which appeared in the indictment, the variance violates the defendant's substantial right to be tried only on charges returned by a grand jury." Id. (citations and quotation marks omitted, emphasis and alteration in original). "If, on the other hand, the variance does not alter the elements of the offense charged, [courts] focus upon whether or not there has been prejudice to the defendant." Id. (alteration in original).

---

promoter.

Counts 21 and 23 of the indictment included the following language:

On or about the following dates, in the district of New Jersey, and elsewhere, the below-named defendants did knowingly and wilfully travel in interstate and foreign commerce as described below, with intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of an unlawful activity, that is, bribery, contrary to N.J.S.A. 2C:21–10(a)(4) and 2C:21-10(b), and therafter did perform, and cause the performance of an act to promote, manage, establish, carry on and facilitate the promotion, management, and carrying on of said unlawful activity.

. . . .

| Count | Date | Defendants From/To |
|-------|------|--------------------|
| 21 | *11/97* | *Lee, Sr. Colombia to Virginia* |
| 23 | *6/98* | *Lee, Sr. Colombia to Virginia.* Appellee's Supp. App. at |

15

64-65 (emphasis added).

In violation of Title 18, United States Code, Sections 1952 and 2.

Appellee's Supp. App. at 64-65 (emphasis added).

Lee contends that his conviction under these counts should be overturned because the government impermissibly amended the indictment by presenting evidence at trial, not that *he* traveled from "Colombia to Virginia" on or about "11/97" and "5/98," as the indictment charged, but that Fernandez made those trips. We disagree.

Lee's argument ignores the fact that Counts 21 and 23 charge that the alleged conduct violated "Title 18, United States Code, Sections 1952 *and 2*," Appellee's Supp. App. at 65 (emphasis added), and under 18 U.S.C. § 2 Lee could be held liable as a principal for Fernandez's travel in interstate or foreign commerce if Lee aided, abetted, counseled, commanded, induced, procured, or willfully caused Fernandez to engage in that conduct. We have previously noted that criminal indictments are to be read "as a whole and interpret[ed] in a common sense manner." Gov't of the Virgin Islands v. Moolenar, 133 F.3d 246, 250 (3d Cir. 1998).[10] Accordingly, even though Counts 21 and 23 of Lee's indictment could perhaps have been more carefully drafted, it is apparent that these counts apply both to travel in aid of racketeering by Lee himself, acting as principal, and to Lee's aiding and abetting the travel in aid of racketeering of another unnamed individual or individuals. The evidence presented at trial showed that Lee aided and abetted Fernandez's travel to and from Colombia but did not show such travel by Lee. The elements of the offense charged in Lee's indictment were therefore narrowed at trial. Accordingly, we look to whether Lee suffered any prejudice. Asher, 854 F.2d at 1497. The indictment charged Lee with aiding and abetting travel between Colombia and Virginia by an unnamed individual on or about November of 1997 and June of 1998. Evidence at trial showed that Fernandez, the IBF's South American representative and Lee's co-indictee, was the unnamed individual that Lee had aided and abetted in his travels between Colombia and Virginia during these months. We cannot believe Lee was prejudiced by this narrowing of the government's theory at trial.

F.

---

[10]Moolenar dealt with an information, as opposed to an indictment, but stressed that, for the purpose of assessing the permissibility of amendments at trial, an information and an indictment should be treated in the same manner. 133 F.3d at 248.

Lee's last argument is that the District Court erred when it sentenced him to concurrent terms of 22 months' imprisonment on the two tax counts, which charged violations of 26 U.S.C. § 7206. Because Lee did not raise this argument in the District Court, we review for plain error. United States v. Gricco, 277 F.3d 339, 350 (3d Cir. 2002).

Title 26, United States Code Section 7206 provides that any violation may be punished by a fine of "not more than $100,000 . . . or imprison[ment for] not more than 3 years." 26 U.S.C. § 7206. Section 3D1.2 of the Sentencing Guidelines directs a sentencing court to group "[a]ll counts involving substantially the same harm," and Section 5G1.2(b) of the Guidelines instructs a court to apply the same sentence to each count in the same group, unless the statutorily authorized maximum for that count is less than the minimum of the guideline range or the statutory minimum is greater than the maximum of the guideline range. U.S.S.G. § 5G1.2(b) (referring to §§ 5G1.1(a) and (b)). At the sentencing hearing, the District Court determined the offense level for Lee's money laundering and Travel Act offenses to be 16 and the offense level for his tax convictions to be seven. Joint App. at 3646-48. The Court did not commit plain error when it grouped these offenses. The Court proceeded to identify a guideline range of 21 to 27 months, based on an offense level of 16 and Lee's criminal history category of I. Id. at 6. The Court then imposed concurrent sentences of 22 months on all

six counts. Id. at 3700. Because the statutory maximum for Lee's tax offenses, 3 years, is not less than the minimum guideline range of 21 months, and because there was no mandatory minimum term of imprisonment for those offenses, the District Court did not commit plain error when it imposed the same concurrent 22-month sentence on all counts.

### III.

For the reasons explained above, we affirm the judgment of the District Court.


McKee, Circuit Judge, dissenting.


"What a person *knowingly* exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz v. United States*, 389 U.S. 347, 351 (1967) (emphasis added). Today my colleagues stretch that rule to include personal effects that a person *unknowingly* exposes to the public. Accordingly, I must respectfully dissent from the majority's rejection of Lee's Fourth Amendment claim.

### I. BACKGROUND

The FBI rented a hotel suite for Lee in June and December of 1997. The suite consisted of "a sitting room and kitchenette, from which one could walk through a continuously open door, into a bedroom, which also had a bathroom in it." A496-97. C. Douglas Beavers, the government's cooperating witness, rented

the hotel suite in Lee's name on behalf of the government and kept a key for himself. However, both Lee and Beavers treated the suite as if it was exclusively Lee's hotel room.

With Beavers' consent, the FBI concealed a video camera and microphone in the suite after Beavers rented it. The camera could swivel 360 degrees and transmit video images from the living room area and part of the bedroom area of Lee's suite 24 hours a day. Special Agent Reilly of the FBI monitored the hidden surveillance equipment from an adjacent hotel room the government had rented for that purpose. Reilly could remotely control the camera and equipment in Lee's suite from her location in the adjoining room. The equipment in Lee's room continuously transmitted video and audio to the receiving equipment operated by Agent Reilly although she could not receive or record those transmissions unless her equipment was turned on.

Agent Reilly testified without contradiction that she did not turn her equipment on or monitor any of the transmissions from Lee's suite unless Beavers was in the suite with Lee. However, the camera could scan and focus on different areas of Lee's suite whether or not Beavers was there. *See* Reply Br. at 4 n.1.

When Beavers visited Lee, he also wore a "body wire" capable of sending audio transmissions to the equipment in Agent Reilly's adjoining room. However, Beavers' body transmitter apparently malfunctioned and the FBI was only able to monitor and record audio transmissions by utilizing the microphone and camera hidden inside Lee's suite. The audio and video recordings that resulted from this surveillance constituted the primary evidence for the only counts on which Lee was convicted.

The Government argues that "Beavers' view of the room was unobstructed, and he could look around the room at will. Nothing was concealed from Beavers that was visible to the camera." *See* Appellee's Br. at 28. However, that claim is not supported by this record, and the district court did not focus on that aspect of Lee's argument. Instead, it found that Lee had no expectation of privacy in his hotel suite because he admitted Beavers to the room, and Beavers' presence negated Lee's Fourth Amendment expectation of privacy under *Hoffa v. United States*, 385 U.S. 293 (1966). A498.

## II. DISCUSSION

### A. *Katz* and *Hoffa*

The Supreme Court first addressed the tension between law enforcement's use of technology and the Fourth Amendment's guarantee of privacy in *Katz v. United States*. 389 U.S. 347 (1967). There, FBI agents attached an electronic device to the outside of a public telephone booth that Katz was suspected of using for gambling-related telephone calls. The device allowed the FBI to surreptitiously listen to Katz's end of telephone conversations. Based primarily upon

evidence obtained from monitoring those calls, Katz was subsequently convicted of using the telephone for interstate transmission of gambling information in violation of 18 U.S.C. § 1084. Following his conviction, Katz appealed the trial court's denial of his motion to suppress evidence derived from the electronic interception of his telephone conversations.

The Supreme Court concluded that Katz's expectation of privacy in the content of his calls was reasonable even though he was standing in a public telephone booth in full view of everyone passing by, and that the electronic interception of his telephone calls constituted a "seizure" under the Fourth Amendment even though it was accomplished without physically invading the place where the monitoring occurred. Therefore, absent exigencies that were not present, the seizure was subject to the warrant requirement of the Fourth Amendment. The Court explained:

> [B]ypassing a neutral predetermination of the *scope* of a search leaves individuals secure from Fourth Amendment violations only in the discretion of the police.

> These considerations do not vanish when the search in question is transferred from the setting of a home, an office, or a hotel room to that of a telephone booth.

Wherever a man may be, he is entitled to know that he will remain free from unreasonable searches and seizures. The government agents here ignored the procedure of antecedent justification . . . that is central to the Fourth Amendment, a procedure that we hold to be a constitutional precondition of the kind of electronic surveillance involved in this case. Because the surveillance here failed to meet that condition, and because it led to the petitioner's conviction, the judgment must be reversed.

389 U.S. at 358-59 (internal quotation marks and citations omitted).

The majority relies upon *Hoffa v. United States*, 385 U.S. 293 (1966), in concluding that Lee's expectation of privacy inside the intimacy of his hotel suite was not reasonable. However, on this record, that is an unjustified and unsupportable extension of *Hoffa* and its progeny.

The defendant in *Hoffa* was convicted of jury tampering based primarily upon the testimony of Edwin Partin, an official of a Teamsters Union local in Nashville, Tennessee, where Hoffa and other union officials were on trial for violating the Taft-Hartley Act. During the course of that trial, the government

became concerned that Hoffa and his co-defendants might attempt to bribe some of the jurors. Unbeknownst to Hoffa, the government recruited Partin to gather evidence of jury tampering. Partin was able to visit Hoffa's hotel suite and Hoffa spoke freely of attempting to bribe jurors in his presence. Hoffa's trial for Taft-Hartley violations ended with a hung jury, but Hoffa was thereafter convicted of jury tampering based largely on Partin's testimony about statements Hoffa had made in his hotel suite.[11] Hoffa appealed arguing in part that Partin's testimony should have been suppressed because it was obtained in violation of the Fourth Amendment. Hoffa argued that Partin's failure to disclose that he was "a government informer vitiated the consent that [Hoffa] gave to Partin's repeated entries into the [hotel] suite, and that by listening to [Hoffa's] statements Partin conducted an illegal 'search' for verbal evidence." 385 U.S. at 300.

The *Hoffa* Court began its analysis by conceding that the legal predicate of Hoffa's argument rested on solid ground.

> A hotel room can clearly be the object of Fourth Amendment protection as much as a home or office. .

. . The Fourth Amendment can certainly be violated by guileful . . . intrusions into a constitutionally protected area. . . . And the protections of the Fourth Amendment are surely not limited to tangibles, but can extend as well to oral statements.

*Id*. at 301. The Court explained:

> The Fourth Amendment protects . . . the security a man relies upon when he places himself or his property within a constitutionally protected area, be it his home or his office, his hotel room or his automobile. There he is protected from unwarranted governmental intrusion. And when he puts something in his filing cabinet, in his desk drawer, or in his pocket, he has the right to know it will be secure from an unreasonable search or an unreasonable seizure.

*Id*. (footnote omitted). However, the Court rejected the balance of Hoffa's argument because Hoffa's disclosures resulted from his relationship with Partin, not any reliance on the privacy of his hotel suite.

---

[11] The government's evidence at the jury tampering trial consisted primarily of Partin's testimony about statements he heard Hoffa make while in Hoffa's hotel room during the first trial.

Thus, there was no reasonable expectation of privacy in the contents of the statements made to Partin, and no Fourth Amendment privacy interest prevented Partin from testifying about Hoffa's "confidential" statements. The Court explained:

> It is obvious that [Hoffa] was not relying on the security of his hotel suite when he made the incriminating statements to Partin or in Partin's presence. Partin did not enter the suite by force or by stealth. He was not a surreptitious eavesdropper. Partin was in the suite by invitation, and every conversation which he heard was either directed to him or knowingly carried on in his presence. The petitioner, in a word, was not relying on the security of the hotel room; he was relying upon his misplaced confidence that Partin would not reveal his wrongdoing.

*Id*. at 302.

The same is true here, but only to a point, and it is this limitation that the majority ignores in allowing *Hoffa* to swallow *Katz* on this record, and gulp down the Fourth Amendment in the process. Under the majority's *Hoffa* analysis, once Lee allowed Beavers to enter the suite, Lee no longer had a reasonable expectation of privacy and *Katz* becomes irrelevant. I disagree.

*Hoffa* teaches that one's expectation of privacy is compromised, and therefore unreasonable, to the extent that he or she confides in a confederate because the speaker is assuming the risk that the confederate may subsequently betray the speaker's trust and repeat anything communicated in "private." The same logic dictates that one has no reasonable expectation in the privacy of anything he/she *knowingly* allows the confederate to see in the presumed privacy of a home or hotel room, or elsewhere.[12] As noted above, the government concealed a microphone and video camera in the sitting room area inside Lee's hotel suite. From that vantage point, the government was capable of monitoring Lee's activity inside his suite 24 hours a day by way of audio and video transmissions to Agent Reilly in the adjoining room.

The government maintains that it took steps to insure Lee's privacy and to guarantee that its actions were consistent with the pronouncements in *Hoffa*. It argues that Agent Reilly did not start monitoring the transmissions from Lee's suite until Beavers arrived, that she turned

---

[12] This has been referred to as the "invited informant" doctrine. *See, e.g., United States v. Nerber*, 222 F.3d 597, 605 n.10 (9th Cir. 2000). For convenience, I will use that phrase throughout my discussion.

the equipment off when Beavers left, and that she did not turn it on in Beavers' absence. My colleagues conclude that this restraint was consistent with Lee's expectation of privacy under *Hoffa*, and therefore no Fourth Amendment violation occurred. In doing so, my colleagues ignore the fact that the Court in *Katz* rejected that very argument.

The Court in *Katz* began its analysis by noting the restrained manner in which the government had obtained the evidence there.

> [T]he surveillance was limited, both in scope and in duration, to the specific purpose of establishing the contents of petitioner's unlawful telephonic communications. The agents confined the surveillance to the brief periods during which he used the telephone booth and they took great care to overhear only the conversations of the petitioner himself.

389 U.S. at 354 (footnotes omitted). Accordingly, there, as here, the actual surveillance had been conducted "in an entirely defensible manner[.]" *Id*. There, as here, "[i]t [was] apparent that the agents . . . acted with restraint" *Id*. at 356. Nevertheless, the Court concluded that this self-imposed restraint could not legitimize the warrantless seizure of Katz's conversations in the public telephone booth. The Court reasoned:

> [T]he inescapable fact is that this restraint was imposed by the agents themselves, not by a judicial officer. They were not required, before commencing the search, to present their estimate of probable cause for detached scrutiny to a neutral magistrate. They were not compelled, during the conduct of the search itself, to observe precise limits established in advance by a specific court order. Nor were they directed, after the search had been completed, to notify the authoring magistrate in detail of all that had been seized. *In the absence of such safeguards, this Court has never sustained a search upon the sole ground that officers reasonably expected to find evidence of a particular crime and voluntarily confined their activities to the least intrusive means consistent with that end.*

*Id*. at 356-57 (emphasis added).

Accordingly, I fail to see the significance of the government's self-imposed restraint here. Despite those self-

22

imposed limitations, the fact remains that Agent Reilly had the ability to manipulate a video camera to see and hear practically everything that Lee did in the privacy of his hotel suite throughout the day and night. The limitations of that Orwellian capability were not subject to any court order. Rather, they were defined by the curiosity and scruples of a single agent. That is simply not adequate given the importance of Fourth Amendment guarantees.

> If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be secure in their persons, houses, papers and effects, only in the discretion of the police.

*Terry v. Ohio*, 392 U.S. 1, 22 (1068) (internal quotation marks and citation omitted).

Moreover, the agents in *Katz* did not even initiate their electronic monitoring "until investigation of the [defendant's] activities established a strong probability that he was using the telephone in question [for interstate gambling purposes]." 389 U.S. at 354. Here, there is no such representation. In fact, it is clear that Lee was not using the hotel suite for illegal purposes before the government installed microphones and cameras there and arranged for him to occupy it.

The government attempts to negate the reasonableness of Lee's expectation of privacy by suggesting that, since Lee knew Beavers paid for the room and retained a key, "Lee's expectation of privacy in the room was relatively diminished." Appellee's Br. at 21. However, as noted above, both parties regarded the suite as Lee's and the government does not seriously argue to the contrary. Everyone involved apparently knew that Lee was to remain in the suite overnight, and there is nothing to suggest that anyone ever expected Beavers to remain in the suite for any length of time. "From the overnight guest's perspective," the expectation of privacy in a hotel room is entitled to the same respect as afforded one's actual home under the Fourth Amendment. *Minnesota v. Olson*, 495 U.S. 91, 99 (1990). Thus, "[n]o less than a tenant of a house, or an occupant of a room in a boarding house, . . . a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures." *Stoner v. California*, 376 U.S. 483, 490 (1964).

Accordingly, the fact that Beavers rented the suite for Lee and retained a key to Lee's suite before surrendering possession to Lee for the latter's sole occupancy is little more than a technicality of convenience that the government devised to fortify this intrusion against the expected suppression motion. It is entitled to no more consideration than that.

> [I]t is unnecessary and ill-advised to import into the law surrounding the

23

constitutional right to be free from unreasonable searches and seizures subtle distinctions, developed and refined by the common law in evolving the body of private property law which, more than almost any other branch of law, has been shaped by distinctions whose validity is largely historical. (W)e ought not to bow to them in the fair administration of the criminal law.

*Id.* at 488. To the extent the Fourth Amendment has any vitality in an era of increasingly sophisticated electronic eavesdropping, it surely protects the privacy of someone in the intimacy of a hotel suite from the potential of warrantless 24-hour video surveillance.

As noted above, the majority concludes that the Supreme Court's analysis in *Hoffa* negates Lee's claim of privacy. Lee, like Hoffa, "was not relying on the security of his hotel suite when he made incriminating statements to [Beavers] or in [Beavers'] presence." *Hoffa*, 385 U.S. at 302. Beavers, like the confederate in *Hoffa*, "was in the suite by invitation, and every conversation which he heard was either directed to him or knowingly carried on in his presence." *Id.*

It is now clear that the Fourth Amendment does not protect "a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." *Id.* However, this means that Lee's expectation of privacy is only unreasonable insofar as he actually made statements in Beavers' presence, or allowed Beavers to see the effects inside his suite. It does not mean that Lee's expectation of privacy in things beyond Beavers' earshot or line of sight was unreasonable. Indeed, that expectation remained reasonable and should be protected under the Fourth Amendment.

However, the concealed camera was capable of sweeping the hotel suite at a 360-degree angle, thereby displaying for the FBI all of Lee's effects inside the suite whether or not Beavers would have been able to see them. Neither *Hoffa* nor any other legal precedent supports such an abrogation of the fundamental right of privacy.

**B. Lee's Right of Privacy**

The Fourth Amendment states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." U.S. CONST. Amend. IV. At the very core of the Fourth Amendment "stands the right of a [person] to retreat into [his or her] own

home and there be free from unreasonable governmental intrusion." *Silverman v. United States*, 365 U.S. 505, 511 (1961).

It has often been said that "the Fourth Amendment protects people, not places." *Katz*, 389 U.S. at 351. However, my colleagues appear to assume that since Lee admitted Beavers to his suite (the place), Lee (the person) lost all constitutional protection. That conclusion would be warranted if Lee had allowed Beavers' unlimited access to everything that was within the 360-degree field of vision of the video camera. However, despite its assertion to the contrary, the government has not established that he did. "[T]he capacity to claim the protection of the Fourth Amendment depends . . . upon whether [Lee] has a legitimate expectation of privacy" in those portions of his hotel room that were beyond the gaze of Beavers. *Minnesota v. Olson*, 495 U.S. 91, 95 (1990) (ellipsis in original; internal citation and quotation marks omitted).

Unlike my colleagues, I conclude that Lee's expectation of privacy in anything inside the suite that he did not knowingly let Beavers see was reasonable, and entitled to Fourth Amendment protection.

Moreover, the government was able to peer into Lee's hotel room even after Beavers left. "When [the informant] leaves [the] premises, [the subject] is left with the expectation of privacy in his surroundings which is not only actual but justifiable. . . ." *United States v. Padilla*, 520 F.2d 526, 527 (1st Cir. 1975) (citing

*Katz*, 389 U.S. 347).

## C. Video Surveillance Under *Hoffa*

In *United States v. Felton*, 753 F.2d 256 (3d Cir. 1985), we explained the invited informant rule in the context of a monitored telephone conversation. There, we stated:

> Insofar as the Fourth Amendment is concerned, one party to a telephone conversation assumes the risks that the other party (a) will permit a third party to eavesdrop on an extension telephone, for the purpose of communicating what he heard to the police, or (b) may be a police informer who will relate or record or transmit a conversation to the authorities, or (c) may record the conversation and deliberately turn it over.

*Id*. at 260. We then stated: "the expectation of privacy is not measured by what takes place during or after the conversation, it is measured by what is expected before the conversation begins." *Id*. As then-Chief Judge Aldisert so plainly explained, "[w]hen you pick up that phone and talk, you can't trust nobody, nohow, nowhere!" *Id*.

*Hoffa's* reliance on the Court's earlier decision in *Lopez v. United States*, 373 U.S. 427 (1963) clearly demonstrates this. *Lopez* is even more relevant to Lee's

claim here because in *Lopez*, unlike in *Katz,* the government concealed a transmitter and recorder on a government agent. That agent then interviewed the defendant in the latter's office after being invited in. The defendant was convicted of offering the agent a bribe based on the ensuing conversation, and thereafter argued that the trial court had erred in refusing to suppress recordings of conversations with the agent. The *Lopez* Court began by noting that "it [was] plain that [the agent] could properly testify about his conversation with Lopez;" thus, "the constitutional claim relating to the recording of that conversation emerge[d] in proper perspective." 373 U.S. at 438. The Court concluded that the recordings were properly admitted at trial because "[t]he Government did not use an electronic device to listen in on conversations it could not otherwise have heard." Rather, "the device was used only to obtain the most reliable evidence possible of a conversation in which the Government's own agent was a participant and which that agent was fully entitled to disclose." *Id.*[13] However, neither *Lopez* nor *Hoffa* allow the government to go

---

[13] The Court likened Lopez' position to an argument that he had "a constitutional right to rely on possible flaws in the agent's memory, or to challenge the agent's credibility without being beset by corroborating evidence that is not susceptible to impeachment." *Lopez*, 373 U.S. at 439. That position was, of course, untenable.

farther and substitute its own electronically enhanced senses for the mortal senses of the informant. Putting aside for a moment the ability to monitor Lee's suite when Beavers left, absent a showing that Beavers and Agent Reilly were limited to identical observations while Beavers was in Lee's suite, the government's surveillance simply goes too far. The problem is only exacerbated by the fact that Agent Reilly had the capability of monitoring Lee at all hours of the day and night even though Beavers was not in the suite. As noted above, it is clear under *Katz* that the fact that Agent Reilly did not peek is not relevant to this invasion of Lee's privacy under the Fourth Amendment.

My colleagues note that they "are satisfied that the tapes [here] do not depict anything material that Beavers himself was not in a position to hear or see while in the room." Maj. Op. at 13. Again, putting aside the intrusion that occurred when Beavers was not even in the suite, I must still respectfully disagree with the majority's analysis. The government concedes that the camera continued to transmit video surveillance of Lee's room on occasion when Beavers left Lee's presence to go to the bathroom, and there is no showing that, in Beavers' absence, Agent Reilly could only see objects that Beavers had already seen, or would see when he returned to the sitting area where Lee remained. Similarly, there has been absolutely no finding here that Agent Reilly was only able to see what Lee knowingly allowed Beavers to see while

26

Beavers was in Lee's presence. Despite its claim that Reilly only saw what Beavers saw, the government concedes that any such limitation on its surveillance would be extremely impractical if not impossible.

### D. Audio Surveillance Is Distinguishable From Video Surveillance

My colleagues concede that video surveillance "may involve a greater intrusion on privacy than audio surveillance." *Id*. at 10-11. Indeed, they could hardly do otherwise. As the Court of Appeals for the Ninth Circuit has observed, in the case of video surveillance:

> [t]he governmental intrusion [is] severe. Hidden video surveillance is one of the most intrusive investigative mechanisms available to law enforcement. . . . [W]e [have] pointed out . . . [that] the defendant ha[s] a reasonable expectation to be free from hidden video surveillance because the video search was directed straight at him, rather than being a search of property he did not own or control .... [and] the silent, unblinking lens of the camera was intrusive in a way that no temporary search of the office could have been.

*United States v. Nerber*, 222 F.3d 597, 603 (9th Cir. 2000). The court in *Nerber*

*quoted* Judge Kozinski's concurring opinion in *United States v. Koyomejia*, 970 F.2d 536, 551 (9th Cir. 1992). There, Judge Kozinski stated: "every court considering the issue has noted [that] video surveillance can result in extraordinarily serious intrusions into personal privacy. . . .*"*

This distinction between video and audio surveillance is dismissed by my colleagues. They conclude that "[t]he difference is not nearly as great as the difference between testimony about a conversation and audio recordings of conversation." Maj. Op. at 11. My colleagues then correctly note that "the Supreme Court has not drawn any distinction between those two types of evidence," and they therefore find "no constitutionally relevant distinction between audio and video surveillance in the present context." *Id.* I must again respectfully disagree.[14]

The government correctly states that it would be extremely impractical to create a situation where the camera's view would be limited to the view of an

---

[14] The majority does not state whether the Supreme Court has been called upon to decide if there is a distinction between video and audio surveillance under the Fourth Amendment. My research did not reveal any such case. Therefore, the Supreme Court's failure to draw a distinction is irrelevant. The Court has never been presented with the question.

informant. We all know that we can not see around corners although we can hear around corners. Everyday experience teaches enough physics to know that observers with different lines of sight will have different fields of vision and therefore see different things or the same thing from different angles. One need not study Gestalt theory to appreciate that two observers who see the same object from different angles may "see" two entirely different objects. The observer at point A in a given space may not see the same thing as an observer at point B in the same space. Moreover, no two observers can possibly occupy the exact same space at the same time, and the extent to which their observations may differ increases with the distance between the two observers as well as the increase in the angle formed by their location and the location of the objects they are observing.

The amount of discrepancy in their observations may also depend on the presence of objects in the space between them and the object they are viewing. There is nothing on this record to support a conclusion that Agent Reilly could only see what Beavers could see at any given instance and I think it fair to say that proposition is a virtual impossibility given the configuration of the usual hotel suite, the number of objects inside it, and the fact that Beavers and the video camera could not possibly have been looking at any given object from exactly the same place.

However, Agent Reilly may well have been only able to hear the same sounds that Beavers heard depending on such factors as the sensitivity of the microphone, transmitting and receiving equipment, as well as the presence of any electronic interference in Lee's room or Reilly's.[15] Nevertheless, since no court has yet addressed the impact of such variables as the sensitivity of the equipment on an invited informant analysis under *Hoffa*, I will assume *arguendo* that Agent Reilly could only *hear* what Beavers heard. However, as I have explained, the same can not be said of the video transmission. This distinction between audio transmissions and video transmissions is crucial to any analysis under *Hoffa* and its progeny if the Fourth Amendment is to withstand the increasing sophistication of electronic surveillance equipment.

The government argues that unless we ignore this technicality "video surveillance would be limited to circumstances where an informant is wearing eyeglasses containing mini-video recorders[,]" and the government emphasizes that "[s]uch a requirement is impractical." Appellee's Br. at 28. However, we can not condone a constitutional violation merely because complying with the Constitution would be "impractical." Nor is the government's sarcastic observation that it "is unaware of the existence of such James Bond-like gadgets[,]" *id.,* a satisfactory reply. If the

---

[15] *See* The Physics of Sound, http://interface.cipic.ucdavis.edu/CIL_tutorial/3D_phys/3D_phys.htm (viewed on Jan. 22, 2004).

28

government wishes to engage in this kind of invasive surveillance it need only visit a neutral magistrate; it need not impose upon "Q."[16]

Things that Lee did not knowingly disclose to Beavers remain within Lee's expectation of privacy so long as that expectation is reasonable, and society is willing to accept the expectation as such. "The test of legitimacy is not whether the individual chooses to conceal assertedly 'private' activity, but whether the government's intrusion infringes upon the personal and societal values protected by the Amendment." *Oliver v. United States*, 466 U.S. 170, 182-83 (1984).[17]

The government maintains that "no part of the meeting rooms was obstructed from Beavers' line of sight, and thus, Beavers could see whatever the camera

---

[16] Those familiar with the *James Bond* series will recognize "Q" as the bureau chief charged with outfitting Bond with all kinds of unimaginable gadgets.

[17] "Since *Katz v. United States*, 389 U.S. 347 (1967), the touchstone of [Fourth] Amendment analysis has been the question whether a person has a constitutionally protected reasonable expectation of privacy. The Amendment does not protect the merely subjective expectation of privacy, but only those expectations that society is prepared to recognize as reasonable." *Oliver v. United States*, 466 U.S. 170, 177 (1984) (internal citations, quotation marks and parentheses omitted).

could capture (albeit at a different angle)." Appellee's Br. at 20. As noted above, the majority accepts this premise, stating that it is "satisfied that the tapes do not depict anything *material* that Beavers himself was not in a position to hear or see while in the room. . . ." Maj. Op. at 13 (emphasis added). However, that is supported only by the government's unsupported assertion. The district court never found that the camera's transmissions were no greater than Beavers' observations. In fact, the district court found this was specifically not the case; it noted that "[t]here were instances . . . where perfection was not achieved" such as when Agent Reilly monitored the sitting room while Beavers visited the bathroom. A497. The district court dismissed this "imperfection" stating: "[t]he brief exceptions do not warrant suppression of any or all of the evidence taken on that ground," and the court noted the government's offer to edit out the images recorded while Beavers was in the bathroom. A498. However, the right of privacy can not be quantified in this manner. .

As the Court explained in *Kyllo v. United States*, 533 U.S. 27, 37 (2001), "[i]n the home, our cases show, *all* details are intimate details, because the entire area is held safe from prying government eyes." Thus, everything and anything inside Lee's hotel suite was an intimate detail meriting Fourth Amendment protection to the extent that Lee did not knowingly allow Beavers to see it. All such details "were intimate details because they were details

29

of the home. . . ." *Id*. at 38. "It matters not that the search uncovered nothing of any great personal value to [Lee] . . . A search is a search, even if it happens to discloses nothing [of value]." *Arizona v. Hicks*, 480 U.S. 321, 325 (1987).

The district court's minimization of the "imperfection" that occurred, and the majority's failure to insure that Agent Reilly could see nothing more than Beavers could see, undermines their entire analysis of Lee's Fourth Amendment claim. The problem is that Lee's reasonable expectation of privacy was violated, not that the violation may not have revealed anything that was "material" or of evidentiary significance. "The Fourth Amendment's protection of the home has never been tied to measurement of the quality or quantity of information obtained." *Kyllo*, 533 U.S. at 38. Thus, "any physical invasion of the structure of the home, 'by even a fraction of an inch,' [is] too much." *Id*. at 37 (quoting *U.S. v Silverman*, 365 U.S. at 512).[18]

---

[18] The Court also noted in *Kyllo* that "*any* information regarding the interior of the home that could not otherwise have been obtained without physical 'intrusion into a constitutionally protected area'. . . constitutes a search." 533 U.S. at 34. Thus, a search of Lee's suite occurred to the extent that Agent Reilly was able to see anything that Beavers was unable to see, notwithstanding the application of the invited informant doctrine. Obviously, an even greater intrusion occurred once Beavers left and the government's camera

Lee's motion to suppress the video tapes should have been granted not because of the materiality of evidence that the governmental intrusion disclosed, but simply because the government's actions violated Lee's reasonable expectation of privacy in his hotel suite.

### E. *Bond v. United States*

Although the case arises in a very different context, *Bond v. United States*, 529 U.S. 334 (2000), demonstrates the extent to which society recognizes the reasonableness of a residuum of privacy even when some privacy has been surrendered. The defendant there sought to suppress evidence obtained when his carry-on luggage was searched by Border Patrol Agents who had boarded a bus in Texas to check on the immigration status of passengers. As an agent walked through the bus he squeezed the soft luggage which passengers had placed in an overhead storage space. Upon squeezing the defendant's bag the agent felt a "brick-like" object, which the agent assumed to be drugs. That search resulted in a warrantless seizure of drugs inside the defendant's bag. The defendant moved to suppress the evidence. The government argued that the defendant could not have a reasonable expectation of privacy in luggage in an overhead compartment on a bus because "matters open to public

---

remained behind. *See Katz*, 389 U.S. at 356 (as noted above, the "restraint was imposed by the agents themselves, not by a judicial officer.").

observation are not protected by the Fourth Amendment." 529 U.S. at 337. The Court concluded that, although bus passengers expect that their bags may be handled, they do not expect that "other passengers or bus employees will, as a matter of course, feel the bag in an exploratory manner." *Id.* at 338-39. Accordingly, although the actual observation of the defendant's bag in the overhead luggage compartment was not protected by the Fourth Amendment, contents which could only be revealed by manipulation of the bag were subject to a reasonable expectation of privacy. This was true even though police only manipulated the outside of the bag while it remained in place in the luggage rack. Although Bond's carry-on luggage "was not part of his person," the Court was concerned that carry-on luggage is generally used to transport "personal items that, for whatever reason, [individuals] prefer to keep close at hand." *Id.* at 338. Accordingly, the Court recognized the defendant's expectation of privacy in the contents of the bag was reasonable.[19]

In referring to electronic interception of telephone conversations,

the Seventh Circuit has explained, "[e]lectronic interception, being by nature a continuing rather than one shot invasion, is even less discriminating than a physical search, because it picks up private conversations. . . over a long period of time." *United States v. Torres*, 751 F.2d 875, 884 (7th Cir. 1984). This situation is exponentially exacerbated where, as here, the government's ability to see intimate details of a defendant's daily activities as he/she goes about his/her business in the presumed intimacy of a hotel suite depends solely on the discretion of the unsupervised agent controlling the monitoring equipment.

> [A]lthough we may spend all day in public places, when we cannot sleep in our own home we seek out another private place to sleep, whether it be a hotel room, or the home of a friend. Society expects at least as much privacy in these places as in a telephone booth – a temporarily private place whose momentary occupants' expectations of freedom from intrusion are recognized as reasonable. . . .

*Minnesota v. Olson*, 495 U.S. 91, 99 (1990) (internal citation and quotation marks omitted).

Absent a pronouncement from the

---

[19] Although *Bond* involves the "plain view" doctrine, not the "invited informant" doctrine of *Hoffa*, it is nevertheless instructive as it clearly supports the conclusion that Lee's expectation of privacy in the contents of his hotel room was reasonable to the extent that he did not allow Beavers to see his effects.

Supreme Court, or controlling precedent from this court, I simply can not accept the idea that a society that defines privacy as a fundamental freedom can tolerate the warrantless intrusion that occurred here.[20]

## F. *Myers, Yonn* and *Padilla*

In affirming the district court, the majority adopts the analysis in *United States v. Myers*, 692 F.2d 823 (2d Cir. 1982) and *United States v. Yonn*, 702 F.2d 1341 (11th Cir. 1983) and rejects the analysis of the Court of Appeals for the First Circuit in *United States v. Padilla*, 520 F.2d 526 (1st Cir. 1975). However,

---

[20] I can not help but wonder if my colleagues would be as complacent about this situation if presented with a male agent capable of remotely viewing a female suspect in her hotel suite at any hour of the day or night with only self-imposed limitations shielding the female suspect from the wandering eye of the male agent. Clearly, given the analysis of my colleagues that situation would not violate the female suspect's privacy as long as, at some point in the day, she allowed an informant to enter the sitting area of her hotel suite.

I admit that realistic considerations of taste as well as concerns over a jury's reaction to such an intrusion may preclude that situation from ever occurring. But *Katz* seeks to insure that privacy protections be rooted in stronger stuff than the judgment of a given agent or concerns about trial tactics.

*Yonn* does not involve video surveillance and is therefore of extremely limited value to the discussion here for all the reasons I have explained. *Myers* is also of very limited application because the conversations there were not recorded in Myers' hotel room, nor was he an overnight guest in the room where the conversations were recorded.

Myers went to a townhouse to meet with individuals who turned out to be government agents. The court's analysis of Myers' privacy interest consumes only a single sentence in the lengthy opinion. The court states: "[the defendant]'s conversations with undercover agents in whom he chose to confide were not privileged, and mechanical recordings of the sights and sounds to which the agents could have testified were proper evidence." 692 F.2d at 859. The court then cites to *United States v. White*, 401 U.S. 745 (1971).

*White* involved a defendant who was convicted based upon evidence police obtained by using a "radio transmitter" to transmit and secretly record incriminating conversations between the defendant and the government informant. Inasmuch as *White* involved audio transmissions rather than video transmissions, and the *Myers* Court failed to discuss why the video transmissions had no more impact on a subject's privacy than the audio transmissions in *White*, I am remain unpersuaded.

On the other hand, *Padilla* involved video surveillance inside a residence and is

much closer to the situation here, but the court's analysis reads as though partly influenced by a concern for the potential abuses of emerging surveillance technology. My colleagues criticize those concerns noting: "Although *Padilla* was decided more than a quarter century ago and has not been followed in any other circuit, we are not aware of evidence that the installation of recording devices to monitor meetings attended by a cooperating individual has led to the sort of abuse that the *Padilla* Court feared." Maj. Op. at 12. There are several reasons why that criticism is less than convincing.

Initially, I note that the issue of whether this technology has been abused was never raised here and there is absolutely no record one way or the other as to the extent of government any abuses of sophisticated surveillance technology. In addition, very few cases have addressed the problem of video surveillance involving an invited informant. In one that has, a miniature camera was carried in the informant's jacket and transmitted video images to a nearby agent. *See United States v. Davis*, 326 F.3d 361, 363 (2d Cir. 2003).[13] The court rejected the defendant's Fourth Amendment argument stating: "[b]ecause the hidden camera did not capture any areas in which Davis

retained a privacy interest, no Fourth Amendment violation occurred." 326 F.3d at 366. As I note above, no such showing has been made here, and the district court found to the contrary on at least two occasions when Beavers was in the suite. Yet the court in *Davis* was careful to limit is holding to only those things that the informer could see while in the defendant's presence. The court specifically stated: "We . . . extend the rule of *White* and *Lopez* to video recordings that capture images visible to the consensual visitor. . . ." *Id*. at 363.

## G. Dangers Inherent in Warrantless Video Surveillance

Although sensory enhancement has not displaced the guarantes of the Fourth Amendment, "[i]t would be foolish to contend that the degree of privacy secured to citizens by the Fourth Amendment has been entirely unaffected by the advance of technology." *Kyllo*, 533 U.S. 27, 33-34 (2001). However, given the evolving sophistication of technology, it is increasingly imperative that the fundamental liberties guaranteed under the Fourth Amendment not be eroded by the warrantless use of devices that allow the government to see through curtains, walls and doors.

In *Kyllo*, the Court addressed the tension between law enforcement's innovative use of technology, and the right to privacy. The Court stated:

> While it may be difficult to refine *Katz* when the search of areas such as telephone

---

[13] Since the camera was in the informant's jacket, there is a stronger basis to assume that the informant's field of vision closely approximated that of the monitoring agent than exists on this record.

booths, automobiles, or even the curtilage and uncovered portions of residences is at issue, in the case of the search of the interior of homes . . . there is a ready criterion, with roots deep in the common law, of the minimal expectation of privacy that *exists,* and that is acknowledged to be *reasonable.* To withdraw protection of this minimum expectation would be to permit police technology to erode the privacy guaranteed by the Fourth Amendment.

533 U.S. at 34 (emphasis in original).[14]

The Court was careful to reaffirm *Katz* in the face of challenges presented by increasingly sophisticated technology. In doing so, the Court expressed concerns very similar to the concerns in *Padilla* that my colleagues dismiss. Writing for the Court, Justice Scalia states: "[r]eversing [the approach outlined in *Katz*] would leave the homeowner at the mercy of advancing technology . . . that could discern all human activity in the home." 533 U.S. at 35-36. The Court also mentioned that "[t]he ability to 'see' through walls and other opaque barriers is a clear, and scientifically feasible, goal of law enforcement research and development." *Id*. at 36 n.3 (citing The National Law Enforcement and Corrections Technology Center website, www.nlectc.org/techproj/, as visited on May 3, 2001).

In *Silverman*, the Court also mentions electronic devices that, according to the defendant there, warranted revisiting prior cases including *Katz*. The Court explains its refusal to do so as follows:

> We are told that re-examination of the rationale of those cases . . . is now essential in the light of recent and projected developments in the science of electronics. We are favored (sic) with a description of a device known as the parabolic microphone which can pick up a conversation three hundred yards away. We are told of a still experimental technique

---

[14] Although the Court there focused on "the interior of homes," I have already explained that no distinction can be drawn for our purposes between homes, and the interior of Lee's hotel suite, *Olson,* 495 U.S. at 99, and the majority does not suggest the contrary.

whereby a room is flooded with a certain type of sonic wave, which, when perfected, will make it possible to overhear everything said in a room without ever entering it or even going near it. We are informed of an instrument which can pick up a conversation through an open office window on the opposite side of a busy street.

*Silverman*, 365 U.S. at 508 (internal quotation marks and citation omitted).[15]

At the risk of appearing alarmist, I think it important to note that, in rejecting defendant's invitation to reexamine Court precedent because of the evolving technology, the Court explained: "We need not here contemplate the Fourth Amendment implications of these and other frightening paraphernalia which the vaunted marvels of an electronic age may visit upon human society." 365 U.S. at 509.

The majority lists three reasons for rejecting the concerns reflected in *Padilla* and doubting that "law enforcement [is] likely to find" abuse of technology "an alluring strategy." Maj. Op. at 12. My colleagues rely upon the possibility of a civil penalty under *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388

[15] In *Silverman,* the owner of a vacant house had granted police permission to use that property to conduct a surveillance of an attached property where police suspected gambling operations were being conducted. They conducted the surveillance by means of a long "spike microphone" which they passed through the properties' joint wall until it made contact with a heating duct in the target property. That "duct became in effect a giant microphone, running though the entire house occupied by appellants." 365 U.S at 506-07 (internal citation omitted).

The case is distinguishable from the situation here not only because it involves only audio monitoring, but also because the Court's ruling was based on the fact that the defendant did not consent to the intrusion that resulted from the spike mike contacting the heating duct in his property. "[T]he officers overheard the petitioners' conversations only by usurping part of the petitioners' house or office – a heating system which was an integral part of the premises occupied by the petitioners, a usurpation that was effected without their knowledge and without their consent." *Id.* at 511. Here, Beavers' consent to the placing of the camera limits *Silverman's* applicability. However, as explained above, there remains an issue of Lee's reasonable expectation of privacy under *Hoffa* and its progeny.

(1971), the need to acquire a warrant or permission of a cooperating individual to enter the premises to install a monitoring device, and skepticism that law enforcement has anything to gain because "[a] video tape . . . generally reveals whether a cooperating individual is present, and without proof of the presence of the cooperating individual, the tape is inadmissible." Maj. Op. at 13.

I must respectfully characterize the majority's trivialization of the potential for abuse as naive. Operation of the technology mentioned in *Silverman* and *Kyllo* requires neither entry nor permission to enter an area of expected privacy. In *Kyllo*, Justice Scalia mentions several technological innovations that require neither physical entry nor consent. These "include a 'Radar-Based Through-the-Wall Surveillance System,' 'Handheld Ultrasound Through the Wall Surveillance,' and a 'Radar Flashlight' that 'will enable law enforcement officers to detect individuals through interior building walls.'" 533 U.S. at 36 n.3.

In addition, though my colleagues contend that, absent consent, the warrant requirement can be relied upon to prevent abuse of such technology, the facts before us should readily dispose of that notion. It is clear that none of the agents involved in monitoring Lee's hotel suite decided to err on the side of caution and obtain a warrant prior to installing a video camera that could transmit video of his living area, as well as parts of the bedroom and bathroom throughout the day and night. In fact, the record shows that the possibility of a warrant was never even discussed with Agent Reilly. Moreover, Lee clearly did not consent to the FBI installing a camera that could potentially broadcast some images of his bedroom and bathroom activities throughout the day and night. As explained above, we can not rely upon technicalities of consent as found in property law to stretch Beavers' consent that far. *See Stoner v. California*, 376 U.S. 483, 489 (1964). Thus, I do not think the legal analysis in *Padilla* can be dismissed because the opinion might be construed as "alarmist." Rather, the court there expressed the very concerns the Fourth Amendment was intended to protect; concerns that the Supreme Court also expressed in *Silverman* and *Kyllo*.

The majority does concede that it is not willing to go "so far as to say that there is no risk of the type of abuse that worried the *Padilla* Court," but concludes that "the risk is not great enough to justify the holding of the *Padilla* Court." Maj. Op. at 13. However, the holding in *Padilla* rests not upon the risks the court properly identified, but on a proper reading of Supreme Court precedent. The court explained: "We do not read either *White* or its predecessors, *Katz v. United States,* and *Hoffa v. United States*, to go farther than to say that a person has no justifiable expectation that one with whom he converses will not tell the authorities of the conversation, and that accurate recordings of the conversation are therefore permissible." 520 F. 2d 526, 527 (citations omitted). *See also United States v. Shabazz*, 883 F. Supp. 422 (D. Minn.

1995) (relying upon *Padilla* to suppress audio and video recordings of conversations in the defendant's hotel room).

My colleagues' remaining justifications for dismissing the concerns expressed in *Padilla* are equally unpersuasive. The "remedy" of a *Bivens* action is often no remedy at all. The Fourth Amendment is intended to afford a right of privacy, not to compensate individuals whose privacy has been violated. Moreover, limitations that arise under the doctrine of qualified immunity may make it exceedingly difficult to establish the predicate showing of unreasonableness required to sustain an action under *Bivens*. where the alleged transgression involves the innovative application of new technology. *See Saucier v. Katz*, 533 U.S. 194 (2001).[16]

Lastly, my colleagues doubt that "law enforcement would have much to gain from monitoring conversations that occur when a cooperating individual is not present. A video tape of a conversation generally reveals whether a cooperating

individual is present, and "without proof of the presence of the cooperating individual, the tape is inadmissible." Maj. Op. at 13. However, that misses the point on several fronts as I have already explained. The informant's presence does not guarantee that he/she sees the same thing that the government transmits and records and it is therefore not tantamount to consent. More importantly, however, as the Court clearly noted in *Kyllo*, it is the *intrusion*, not the evidence that is the problem. The suppression of the evidence is only important because of its impact on police behavior.[17]

### III. Conclusion

The Constitution's primary bulwark against arbitrary intrusions into our privacy is the warrant requirement of the Fourth Amendment. "The [Fourth Amendment] reflects the recognition of the Framers that certain enclaves should be free from arbitrary government interference." *Oliver v. United States*, 466 U.S. 170, 178 (1984).

> The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the

---

[16] Under *Saucier*, a *Bivens* plaintiff must first establish that legal requirements in a given situation would have been clear to a reasonable officer. *Bennett v. Murphy*, 274 F.3d 133, 136-37 (3d Cir. 2001). The speed of technology's advance will often make that an insurmountable hurdle to a *Bivens* plaintiff challenging the government's warrantless use of a new technology.

[17] For a general discussion of the purposes of the exclusionary rule, see *Terry v. Ohio*, 392 U.S. 1, 13 (1968).

home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals.

*McDonald v. United States*, 335 U.S. 451, 455-56 (1948).

I believe the government's end run around that "high function" here requires that we reverse the district court's ruling on Lee's Fourth Amendment claim. I have already explained that, although Agent Reilly's restraint may be commendable and demonstrate the government's good faith, that is not sufficient given these facts. Rather, as I explained above, a warrant is required to insure that such invasions are warranted and conducted in an appropriate manner. The invited informant doctrine only increases the need to obtain a warrant in advance of this type of video surveillance. "No police officer would be able to know *in advance* whether his through-the-wall surveillance picks up intimate details – and thus would be unable to know in advance whether it is

constitutional." *Kyllo*, 533 U.S. at 39 (internal quotation marks omitted). "[A] search which is reasonable at its inception may violate the Fourth Amendment by virtue of its [subsequent] intolerable intensity and scope." *Terry*, 392 U.S. at 17.

*Katz* was not the first time that the Court has declared that liberties protected by a warrant requirement can not be left to the discretion of law enforcement officers absent exigent circumstances not involved here. More than half a century ago, the Supreme Court declared:

> T]he point of the Fourth Amendment, which is often not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.

*Johnson v. United States,* 333 U.S. 10, 13-14 (1948). That is why the warrant requirement applies in situations such as

the one before us here.[18]

I can not endorse my colleague's willingness to entrust the fundamental right of privacy to law enforcement's discretion. Accordingly, I must respectfully dissent from my colleagues' analysis of Lee's Fourth Amendment claim.

---

[18] In arguing that the government was obligated to obtain a warrant for this kind of electronic surveillance, I realize that the authority of the federal courts to issue search warrants authorizing video surveillance is uncertain under Title III of the Omnibus Crime Control and Safe Streets Act of 1968. *See* 18 U.S.C. § 2511 (a section of Title III).

We have never determined whether Title III authorizes federal courts to issue warrants for video surveillance, and there is considerable authority that it doesn't. *See United States v. Falls*, 34 F.3d 674, 679 (8th Cir. 1994); *United States v. Koyomejian*, 970 F.2d 536, 539 (9th Cir. 1992); *United States v. Torres*, 751 F.2d 875, 880 (7th Cir. 1984). However, although these courts have concluded that Title III does not give federal courts that authority, courts have consistently found that authority under Fed. R. Crim. P. 41(b), as well as under the inherent supervisory powers of federal courts, so long as any warrant that may issue contains the safeguards of the restrictions embodied in Title III. *See, e.g., In the Matter of the Application of the United States of America for an Order Directing X to Provide Access to Videotapes*, 03-MC-89, 2003 U.S. Dist. LEXIS 15227 at *4, *5 n.1, *9 n.3 (D. Md. Aug. 22, 2003); *see also Falls*, 34 F.3d 678-79; *Koyomejian*, 970 F.2d at 542; *Torres*, 751 F.2d at 877-78.